## THE STATE v. McMULLIN, Appellant.

### Division Two, December 16, 1902.

1. **Murder or Self-Defense:** VERDICT CONCLUSIVE UNLESS ERROR SHOWN. Where the evidence showed either murder in the first degree or second degree, or indubitable self-defense, the verdict of the jury is conclusive, where no error in the instructions or the rulings on evidence is shown.

2. **Instructions:** ERROR: NO EXCEPTIONS. Error in failing to give sufficiently full instructions in a criminal case can not be considered on appeal, where no exception was taken on the ground that the instructions were insufficient.

3. ————: MURDER IN SECOND DEGREE. Under Revised Statutes 1899, sections 2369, 2535, providing that the jury, in a criminal case, may find defendant guilty of any inferior grade of such offense, and that any person found guilty of murder in the second degree shall be punished according to the verdict, although the evidence shows him guilty of a higher degree of homicide, etc., an instruction as to murder in the second degree is proper in a prosecution for murder in the first degree, where the evidence is such that the jury might find defendant guilty of murder in either degree.

4. **Homicide:** PRESUMPTION. When a homicide occurs, nothing more appearing, presumptively the crime is murder in the second degree.

5. **Opprobrious Epithet:** ELIMINATES DELIBERATION. The use of an opprobrious epithet by deceased to his slayer immediately before the homicide is a fact tending to eliminate the element of deliberation from the crime, and thus reduce it to murder in the second degree.

6. **Conviction of Second Degree Murder:** INSTRUCTION ON MANSLAUGHTER. Where defendant in a prosecution for homicide was convicted of murder in the second degree, the giving of an instruction on manslaughter in the fourth degree was not prejudicial.

7. **Dying Declaration:** OBJECTION: JURAT. In a prosecution for homicide, an objection made to the introduction of a dying declaration as a whole was insufficient to raise the question of the admissibility of the affidavit or jurat accompanying the statement, and a part thereof.

8. ————: TESTIMONY: CONVERSATION BETWEEN DECEASED AND PHY-
SICIAN. In a prosecution for homicide, where a dying declaration
was admitted in evidence, testimony as to a conversation between
deceased and his physician about the funeral arrangements of the
former was properly admitted, as showing the condition of the
mind of deceased, and also as confirmatory evidence of deceased's
firm conviction of his impending death.

9. Evidence: GENERAL OBJECTION. An objection to evidence as im-
material, incompetent, and irrevelant is too general to raise the
question of its admissibility on appeal.

10. Address to Jury: REPRIMAND. In a prosecution for murder, the
prosecuting attorney said in his argument that a certain defense
was "trumped up" by defendant and one of his witnesses, and stated
that the witness had been brought into court without a subpoena,
like a "cold deck," and was not subpoenaed until the trial began,
which was the reason the State did not impeach her. Counsel for
defendant objected for the reason that there was no evidence as
to when the witness had been subpoenaed. The objection was sus-
tained, and the court admonished counsel to confine himself to the
record. Held, that, in the absence of any request for a more pointed
reprimand, the rebuke was sufficient.

Appeal from Clay Circuit Court.—*Hon. J. W. Alex-
ander*, Judge.

AFFIRMED.

*Farris & Son, Wm. E. Fowler, W. A. Craven* and
*B. P. Finley* for appellant.

(1) The dying declaration of the deceased with
the affidavit attached thereto should not have been ad-
mitted in evidence, and especially over the objection
of the defendant, as the affidavit was in nowise a
part of the *res gestae* and had no connection whatever
with the circumstances of the killing, but was only cal-
culated to impress the minds of the jurors with undue
weight and solemnity as to such dying declaration.
And again, Dr. T. N. Bogard, physician of deceased,
was permitted by the court, over the objection of the
defendant, to give in evidence statements made by de-
Vol 170 mo—39.

ceased in relation to the manner in which he wished his funeral to be conducted. The court assigned as a reason for admitting these statements in evidence, over defendant's objection, that the purpose in admitting them was to show the condition of mind of the deceased. The condition of mind of the deceased was not in issue, and was not put in issue by defendant, but if such had been the fact, the condition of mind of the deceased could not have been proven in such manner, as such statements in going to the jury were purely hearsay—statements separate and independent of the dying declaration of the deceased. Hearsay evidence is incompetent to establish any specific fact which in its nature is susceptible of being proved by witnesses who can speak from their own knowledge. Chouteau v. Searcey, 8 Mo. 734. The condition of mind of deceased, had it been necessary, could have been proven by living witnesses capable of speaking from their own knowledge. The statement given in evidence as testified to by Dr. Bogard, could not be considered as the dying declarations of the deceased for the reason that such statement has no relation to the killing and the facts and circumstances attending it. Neither is it any part of the *res gestae*. State v. Draper, 65 Mo. 335; State v. Vansant, 80 Mo. 67; State v. Reed, 137 Mo. 135. (2) The defendant was greatly injured upon the trial of this case by the unauthorized remarks of the State's attorney in his closing argument. The court's admonition by no means amounted to a rebuke and accomplished nothing in the way of arresting the injury done the defendant by such unauthorized and pernicious statements as were by the counsel for the State then and there made. The court should have given the attorney a severe reprimand so as to have left no doubt in the minds of the jurors of the impropriety of his conduct. Killoren v. Dunn, 68 Mo. App. 212; Fathman v. Tumilty, 34 Mo. App. 236. (3) The declarations of law asked for on the part of the defendant and refused by the court should have been given, while the instructions, given on the part of the

State, upon murder in the second degree or manslaughter in the fourth degree, should not have been given, as there was no testimony upon which to base such instructions and their only effect could be to mislead the jury.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, and *Frank H. Trimble* for the State.

(1)   The fact that the dying declaration was sworn to does not constitute reversible error.   Sworn declarations were admitted in the following cases, which were upheld by the Supreme Court: State v. Sexton, 147 Mo. 98; State v. Nocton, 121 Mo. 544; State v. Brannum, 95 Mo. 22; State v. Meyers, 99 Mo. 120; Wilson v. Reeves, 70 Mo. App. 30; Lumber Co. v. Rogers, 145 Mo. 445.   Defendant should have moved to have that particular portion excluded, but did not do so.   State v. Welsor, 117 Mo. 579.   (2)   (a) The directions in regard to the funeral arrangements given by deceased shortly before he reaffirmed his dying declaration were properly admitted to show that he was absolutely certain that death was at hand and that he had no hope of recovery.   Hughes on Crim. Law and Procedure, p. 32, secs. 114 and 116; 10 Am. and Eng. Ency. of Law (2 Ed.), 387; North v. People, 139 Ill. 102, 28 N. E. 966; Starkie v. People, 17 Ill. 220. (b)   The evidence of which appellant complains was introduced before the court in the absence of the jury upon the hearing of the preliminary proof.   It could not have prejudiced defendant's rights.   No objection was made to this evidence.   Where the evidence objected to is in any way competent, the rule is that a general objection is insufficient.   State v. Meyers, 99 Mo. 120; State v. Westlake, 159 Mo. 678; People's Bank v. Scalzo, 127 Mo. 185.   And the rule is the same in criminal cases as in civil.   State v. Higgins, 124 Mo. 648; State v. Day, 100 Mo. 249.   If defendant had wished to exclude that portion as to the Masonic

lodge he should have moved to strike it out, as re-quired by State v. Welsor, 117 Mo. 579. (3) The remarks by one of the counsel for the State, of which appellant complains, afford no ground for reversal of the case. Appellant objected at the time, and his objection was sustained by the court. State v. Wright, 134 Mo. 418; State v. Hack, 118 Mo. 100; State v. Howard, 118 Mo. 146; State v. Brandenburg, 118 Mo. 187; State v. Dusenberry, 112 Mo. 293; State v. Kaiser, 124 Mo. 672; State v. Emory, 79 Mo. 463. (4) An instruction for murder in the second degree was proper under the evidence. The testimony of defendant that deceased called him a son-of-a-bitch required a second degree instruction. State v. Kotovsky, 74 Mo. 250; State v. Wilson, 98 Mo. 448; State v. Hill, 69 Mo. 452; State v. Ellis, 74 Mo. 207; State v. Frazier, 137 Mo. 340. (5) The instruction for manslaughter in the fourth degree was harmless, as it was in defendant's favor if erroneous, the jury by their verdict saying that he was guilty of a higher crime. State v. Dunn, 80 Mo. 681; State v. Smith, 80 Mo. 519. (6) The dying declaration was clearly admissible. State v. Draper, 65 Mo. 335; State v. Welsor, 117 Mo. 570; State v. Crabtree, 111 Mo. 141; State v. Evans, 124 Mo. 409; Wharton's Crim. Ev. (9 Ed.), sec. 287. (7) The conversation of the decedent to his physician and Captain Moore as to his funeral arrangements was admissible to show that the declaration was made under a sense of impending death.

SHERWOOD, P. J.—Twenty years in the penitentiary was the term of imprisonment awarded defendant for shooting to death with a revolver Albert S. Chambers on December 3, 1900, the jury having found defendant guilty of murder in the second degree, when put upon his trial for the first degree of that crime.

The substance and effect of the testimony will be found adduced in the following statement and such additions as have been made thereto:

The tragedy occurred on the sidewalk at the southeast corner of Broadway and Marietta streets in the city of Excelsior Springs, the same being the northwest corner of what is known as the Boston Store. Broadway, sixty feet wide, runs east and west, and Marietta street, forty feet in width, runs north and south. The bank is located at the southwest corner of these two streets, and its front door is on the corner, so that any one coming out of the door will be facing toward the place where the shooting took place.

Defendant and Chambers, the deceased, were both residents of Excelsior Springs. They had had differences over business matters, and for some time had not been on good terms.

The afternoon of the shooting, the defendant, in company with Samuel J. Rowell, walked north along the west side of Marietta street to Broadway, the bank corner, where they separated, Rowell going on north across Broadway, while McMullin turned east across Marietta, toward the Boston Store corner.

Chambers was walking west along the south side of Broadway, and the two met on the sidewalk at the Boston Store corner. They passed each other a step or two, the deceased turning toward the south as if to go down the east side of Marietta street. As they passed each other one of them called the other a son-of-a-bitch. In his dying declaration, Chambers says McMullin said that to him. McMullin on the other hand testified that Chambers used the epithet toward him. At any rate, as soon as the word was used Chambers turned on his left partially to McMullin and said, ''Go on, I don't want any trouble with you,'' and McMullin fired. Chambers was standing with his hands down by his side, and when the bullet struck him he threw his left hand upon the wound in his breast, his right following immediately, but trembling in the air, as of it were partially paralyzed, and could be raised with difficulty, and then, with both hands clasping his breast, he staggered off the sidewalk diagonally across Marietta street, going in a south-

west direction.    McMullin put his pistol in his pocket and turning continued his walk leisurely up the street, smoking a cigar.

The whole thing happened in an instant.    Just time enough for two men to meet, turn, and the shot was fired.    Rowell, who separated from McMullin at the bank corner, and who was walking across Marietta, heard the shot before he had gotten entirely across the street.

Five days later, Chambers died from the effects of his wound.    Examination revealed the fact that the bullet struck deceased between the seventh and eighth rib, about one inch to the right of the breast bone.    A slight impingement by the bullet upon the flesh immediately to the left of the bullet hole showed that it was undoubtedly fired from a point slightly to the left of deceased.    This was also shown by the fact that the bullet, in passing through the vest, struck at the left edge of the button and passed under the button to the right without injuring it, which it could not have done unless it was fired from a point slightly to deceased's left.

Before his death, Chambers made a dying statement or declaration as to what occurred at the shooting.    He was informed by his physician and by Captain Moore, on the morning of the day he died, that his death was certain and near at hand.    After realizing fully that he was at the point of death, and had no hope of recovery, he dictated his dying statement and signed it.

Said statement being in words and figures the following, to-wit:

"I, Albert Chambers, realize that I am in a dying condition, I have no hope of recovery; realizing I am in the presence of death, make this as my last and dying statement:    I was coming down the street; he, McMullin, said, 'You damn son-of-a-bitch, I will kill you;' when he said that I said, 'You go along, I don't want no trouble with you,' I said, 'Go on, you leave me

alone;' he stopped, took aim and shot me; I said nothing else; I made no threat or demonstration and had no weapon; I had nothing in my hand.  [Dr. Bogard took my knife from my pants pocket after the shooting.]  I am positive I made no demonstration of any kind; McMullin was walking fast and seemed to be mad.  He shot me not two seconds after we met; he took the pistol out of his right hip pocket.  He was standing on the out edge of the sidewalk, and I was standing near the middle.  The first remark made when we met was McMullin called me a damn son-of-a-bitch. This was in front of the Boston Store at Excelsior Springs, Missouri.

"A. S. Chambers.

"T. N. Bogard.
"James W. Snapp.
"John King.
"Josephine Lashley.

"State of Missouri, ⎫ ss.
County of Clay.    ⎬
        "Subscribed and sworn to before me by Albert S. Chambers this 8th day of December, 1900, at 11:30 o'clock a. m.  Term expires June 22, 1901.
"Harris L. Moore.
[Seal.]        "Notary Public, Clay county, Mo."

The words, "Dr. Bogard took my knife from my pants pocket after the shooting," inclosed in brackets, were excluded by the court on its own motion and said words were not read to the jury.

About three-quarters of an hour later he expressed his absolute certainty that he was going to die very soon, and had no hope of recovery, and reaffirmed the declaration as it was read over to him sentence by sentence.  A third time the statement was gone over with him, and he was asked if he was perfectly certain he was going to die soon, and if his declaration were true, and he again expressed his conviction that death was

soon and certain, and declared that his statement was true.

Again, just one hour and forty minutes before he died, in the presence of several witnesses, he said he was about to die and could not recover; and in this solemn moment, when adjured to tell the truth, the whole truth and nothing but the truth, he reaffirmed his declaration sentence by sentence, and then as an entirety.

At the trial, self-defense was set up, the defendant asserting that the deceased drew a knife and was advancing upon him with arm upraised when he fired; and that, upon receiving the wound, deceased closed his knife, replaced it in his trouser's pocket and turned away. A number of witnesses, in various directions from the two, saw what took place the instant the shot was fired. None of them, however, saw anything in deceased's hands, except the defendant himself and Mrs. Henry, a servant in the family of the defendant's mother. The latter testified that she was across the street and saw a knife in deceased's hands. Her testimony, however, is contradicted by that of Mrs. Enlow, another witness, who was standing at defendant's elbow when the shot was fired and who was facing toward deceased within ten feet of him and saw him put his hands on his stomach, but saw no knife. She heard some one use the word "son-of-a-bitch," but could not say who said it.

An old grudge was shown to have existed for years between the defendant and Chambers, and they also indulged in abusive expressions about each other, as either would pass by, and uncommunicated threats had been made against each other by these parties. The testimony of defendant, so far as necessary to be quoted, is the following:

I was going from there up to my hardware store; I crossed the street and as I stepped up, there was a little place there about that wide between the sidewalk and crossing; as I stepped over that I threw my eye up, I saw Albert Chambers coming; well, sir, he was about, I expect, fifteen feet from me; he was on the outside;

State v. McMullin.

I took the inside next to the building; I turned to the right and he went to the right; as we came, as he passed me he drew in from where I was; I had my attention directed up in the door of the Boston building; there was some ladies there, they were just coming down; I was looking at those ladies; he came in next toward me and he said, "You son-of-a-bitch;" I said, "What is that?" it took me on surprise; I said, "What is that?"; by that time he got me on the outside of the walk, very near the outside of the walk; he wheeled around, was looking back when I said "what is that?" he was looking back, still advancing west and passed me and advanced west; he wheeled around, took may be a step or two to the south; as he wheeled around, I come back off the sidewalk, and we were in this position, just about; he was up close to the building then, I was out towards the outer edge of the sidewalk, and as he came around he whipped a knife out, or a blade about that long, and held it in his hand that way, and he said, "You god damned son-of-a-bitch," and started at me. I drew my hand out that way and I said "Don't you cut me with that knife;" he was most on to me, and he kept advancing upon me, when I shot him; he was within three or four feet of me when I shot him; he stopped; I stopped. He threw the left hand up to his breast; he had on an overcoat, a black overcoat; a long-tailed overcoat; whipped that hand back that way, shut that knife, put it in his pocket and turned to go and brought this hand up; after he started to turn, I went on; started up the street. I was not angry; I was walking my usual gait; was thinking of nothing only the trade I was talking of to Mr. Rowell.

The testimony of defendant was supported, to a considerable extent, by several others of defendant's witnesses.

The court instructed the jury upon murder in the first degree, murder in the second degree, manslaughter in the fourth degree and self-defense, reasonable doubt, etc.

The jury found the defendant guilty of murder in the second degree and assessed his punishment at twenty years in the penitentiary, and from the judgment rendered thereon, he appeals.

At the trial, the court first heard the preliminary proof in support of the dying declaration in the absence of the jury, and after ascertaining that the declaration was properly admissible, the jury were brought in and the declaration, together with the preliminary proof, was submitted to them. Defendant complains of this and insists that the jury should not have been allowed to hear the evidence showing that deceased knew he was going to die and had no hope.

Defendant also complains because the jurat to the declaration was read to the jury with the declaration, but no objection was made to it at the time, nor was the court's attention called to the matter in any way.

Defendant also asks that the judgment be reversed because of some remarks made by counsel for State in his argument to the jury, but the trial court promptly sustained the objection and rebuked the attorney by peremptorily ordering him to confine himself to the record.

At the State's request, the court instructed the jury as follows:

"No. 1. These instructions, with those given on behalf of the defendant, constitute the law of this case. It is the duty of the jury to apply the proven facts of the case to the law given in said instructions and find their verdict accordingly and not otherwise.

"No. 2. If you believe from the evidence, beyond a reasonable doubt, that at any time prior to the filing of the indictment herein (which was on the 1st day of March, 1901), the defendant, Thomas McMullin, in Clay county, Missouri, willfully, deliberately, premeditatedly and with malice aforethought, shot and wounded Albert S. Chambers, and that within a year and a day thereafter, and before the filing of the indictment aforesaid, the said Albert S. Chambers, at the county of Clay aforesaid, died in consequence of such shooting

and wounding, then it will be your duty to find the defendant guilty of murder in the first degree.

"No. 3.   If  you believe from the evidence, beyond a reasonable doubt, that the defendant in Clay county, Missouri, at any time prior to the filing of the indictment herein, willfully, premeditatedly and of his malice  aforethought, but not  deliberately,  shot and wounded Albert S. Chambers, and that within a year and a day thereafter, and before the filing of the indictment aforesaid, the said Albert S. Chambers, at the county of Clay aforesaid, died, in consequence of such shooting and wounding, then it will be your duty to find the defendant guilty of murder in the second degree.

"No. 4.   As used in these instructions, the term 'willfully' means that the act must be done intentionally and not accidentally.  In the absence of qualifying facts or circumstances, the law presumes that a person intends the ordinary and probable results of his act and conduct.  'Deliberately' means done in a cool state of the blood.  It does not require that the act should be brooded over or reflected upon for a week, a day, or an hour, but it means an intent to kill, executed by defendant in a cold state of blood, in the furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose, and not under the influence of a violent passion, suddenly aroused by a lawful or some just cause of provocation.  'Premeditatedly' means thought of beforehand for any length of time, however short.  'Malice' does not mean spite, ill-will or dislike, as it is ordinarily understood, but it means that condition of the mind which prompts one person to take the life of another without just cause or provocation, and it signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief.  'Malice aforethought' means malice and premeditation.

"No. 5.   The jury are instructed, that while the law requires that the killing, in order to constitute murder in the first degree, shall be willful, premeditated

and deliberate, still it does not require that the willful intent, premeditation or deliberation shall exist for any prescribed length of time, before the crime is committed; it is sufficient that there was a determination and design to kill distinctly formed in the mind at any moment before, or at the time the shot was fired; and in this case, if the jury believe from the evidence, beyond a reasonable doubt, that the defendant shot and killed the deceased, as charged, and that at the time or before the shot was fired the defendant had formed in his mind a willful, premeditated and deliberate design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose, and without any justifiable cause or legal excuse therefor, as explained in these instructions, then the jury should find the defendant guilty of murder in the first degree.

"No. 6.    You are instructed that he who willfully, that is, intentionally, uses upon another, at some vital part, a deadly weapon, must, in the absence of qualifying facts, be presumed to know that the effect is likely to produce death, and knowing this, must be presumed to intend death, which is the probable consequence of such an act; and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart.

"No. 7.    Upon the question of self-defense, the court instructs you that if at the time defendant shot Chambers, he, the defendant, had reasonable cause to apprehend a design on the part of Chambers to take his life, or to do him some great personal injury, and that there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and that to avert such apprehended danger, he shot, and that at the time he shot he had reasonable cause to believe and did believe that it was necessary for him to shoot and kill to protect himself from such apprehended danger, you will acquit on the ground of self-defense.    It is not necessary that the danger should have been actual or real, or that the danger should

have been impending and about to fall. All that is
necessary is that defendant had cause to believe, and
did believe those facts. On the other hand, it is not
enough that defendant should have so believed. He
must have had reasonable cause to so believe. Whether
or not he had reasonable cause is for you to determine,.
under all the facts and circumstances given in evidence.
If you shall believe from the evidence that defendant
did not have reasonable cause to so believe, you can
not acquit him on the ground of self-defense, although
you may believe that the defendant really thought he
was in danger.

"No. 8. If the jury find from the evidence that the
defendant killed Albert S. Chambers, without delibera-
tion, as defined in these instructions, but under a vio-
lent passion, suddenly aroused by abusive words alone
spoken by said Chambers to him, and not under the
circumstances as would make the killing justifiable upon
the ground of self-defense, as defined in other instruc-
tions, then such killing would not be murder in the first.
degree, because done in the heat of passion aroused
by just cause or provocation, but in such case the de-
fendant would, if the killing was done intentionally and.
of malice aforethought, be guilty of murder in the
second degree.

"No. 9. Even though you may believe from the
evidence that said Chambers was assaulting or in the
act of assaulting the defendant, and using offensive
words or threats towards him, and that defendant,
under the influence of violent passion suddenly aroused
by words, acts and conduct of said Chambers, drew
his revolver, and without premeditation and malice, as.
defined in these instructions, shot deceased, from the
effects of which he died within a year and day there--
after, yet if the alleged shooting was not justified upon.
the ground of self-defense, as explained in other in-
structions, such fact, if any, will not warrant you in
acquitting the defendant altogether, but, in that event,
he should be convicted of manslaughter in the fourth
degree.

"No.  9½.  Even though you may find from the evidence that the deceased, prior to the shooting, made threats against the defendant, yet, if you believe from the evidence that Chambers, at the time of the shooting, was not attempting to carry the threats into execution, and was making no hostile demonstration towards the defendant, then such prior threats will not justify, excuse or palliate the shooting of deceased by defendant.

"No. 10.  Before the defendant can be convicted of any offense under the indictment, the jury must believe from the evidence that the defendant is guilty beyond a reasonable doubt.  A reasonable doubt, however, must be a substantial doubt, arising out of a due consideration of all the testimony, and not a mere possibility of defendant's innocence.

"No. 11.  The defendant is a competent witness in this case, and you should consider his testimony in arriving at your verdict, but in determining what weight and credibility you will give to his testimony, in making up your verdict, you may take into consideration, as affecting his credibility, his interest in the result of the case, and that he is the accused party on trial testifying in his own behalf.

"No. 12.  The jury are the sole judges of the weight of the evidence and the credibility of the witnesses.  If the jury believe that any witness has willfully sworn falsely to any material matter in the case, they are at liberty to disregard all the testimony of such witness.

"No. 13.  If you find the defendant guilty of murder in the first degree, you will simply so state in your verdict.

"No. 14.  If you find the defendant guilty of murder in the second degree you will so state in your verdict, and assess his punishment at imprisonment in the penitentiary for any term, for not less than ten years, that to you may seem proper from the evidence.

"No. 15.  If you find the defendant guilty of manslaughter in the fourth degree, you will so state in your verdict and assess his punishment at imprisonment in

the penitentiary for two years, or by imprisonment in the county jail not less than six months, or by a fine of not less than one hundred dollars, or by both fine of not less than one hundred dollars and imprisonment in the county jail not less than three months."

To the giving of which instructions and each of them counsel for defendant then and there excepted and here saves such exceptions.

At the request of the defendant, the court gave the following instructions:

"No. 1. The jury are instructed that the indictment in this case is, of itself, a mere formal accusation or charge against the defendant, and is not, of itself, any evidence of the guilt of defendant, and no juror should permit himself to be to any extent influenced against the defendant because or on account of the indictment in this case.

"No. 2. The court instructs the jury that the defendant is presumed to be innocent, and this presumption attends and protects him at every stage of the case until it is overcome by testimony which proves his guilt beyond a resonable doubt, and it is not enough in a criminal case to justify a verdict of guilty that there may be strong suspicion or even strong probability of the guilt of defendant, but the law requires proof so clear and satisfactory as to leave no reasonable doubt of defendant's guilt.

"No. 3. Upon the law of self-defense the court instructs the jury that when a person has reasonable grounds to apprehend that someone is about to do him a great bodily harm, and there is reasonable grounds for believing the danger imminent that such design will be accomplished, he may safely act upon appearances, and even kill the assailant, if that be necessary, to avoid the apprehended danger; and the killing will be justifiable, although it may afterwards turn out that the appearances were false, and that there was in fact neither design to do him serious injury nor danger that it would be done.

"No.  4.  Upon the law of self-defense the court further instructs the jury that in passing upon the question whether the defendant had reasonable grounds for believing that there was imminent danger that the deceased was about to kill him or do him some great bodily harm, the jury should determine the question, from the standpoint of the defendant at the time he acted, and under his surroundings at the particular instant of time; and the jury may also, in passing upon that question, take into consideration the threats, if any, made by deceased against the defendant.

"No.  5.  The court instructs the jury that, under the law of this State, a person who has not himself wrongfully provoked the assault, is under no obligation to retreat, but may, when wrongfully assailed, stand his ground; and if at the time it reasonably appears to be necessary to protect himself from death, or great personal injury, may lawfully kill the assailant. If Albert Chambers made an assault and attack upon the defendant, and the defendant had reasonable grounds to believe that he was in danger of being killed, or of receiving great bodily harm from said Albert Chambers, he had a right to take such steps as to him, under the circumstances, reasonably seemed necessary, in order to save his own life or to save himself from great bodily harm, even to the taking of the life of the said Albert Chambers.

"No.  6.  Upon the law of self-defense the jury are instructed that if the defendant, at the time he shot the deceased, had reasonable cause to apprehend, and did apprehend, that the deceased was about either to kill him or to do him some great bodily harm, and that the danger of his doing either was imminent, and that the defendant shot to avert such apprehended danger, then such shooting was justifiable, and you should acquit on the ground of self-defense.  And in this connection the jury are instructed that it is not necessary, in order to acquit on the ground of self-defense, that the danger should, as a matter of fact, have been real or actually impending; all that is necessary is that the

defendant had reasonable cause to believe that the danger was real and about to fall upon him; and if the defendant acted in a moment of apparently impending danger from an assault by the deceased, it was not necessary for him to nicely measure the proper quantity of force necessary to repel the assault. And the question for you to determine is, not what you think it was necessary for the defendant to have done or not done, at the time he shot deceased, but the question is what the defendant might have reasonably believed was necessary for him to do under all the circumstances.

"No. 7. The court instructs the jury that if they believe from the evidence that the deceased, prior to the shooting, made threats against the defendant, they should take such threats into consideration in determining who was the aggressor at the time of the shooting, and whether, in connection with the conduct of the deceased at the time of the shooting, they afforded the defendant a reasonable apprehension of danger. Such prior threats, however, will not justify, palliate or excuse the shooting of the deceased by the defendant, unless you believe from the evidence that Chambers, at the time of the shooting, was attempting to carry the threats into execution by assaulting or attempting to assault the defendant, or by making some hostile, or apparently hostile, demonstration towards the defendant.

"No. 8. The State has introduced in evidence a statement claimed to have been made by Albert Chambers at a time when he was suffering from the wound inflicted by the defendant, and at a time when the said Albert Chambers had given up all hope of living, and was then under the belief that death was imminent and near, and if you believe from the evidence that. Albert Chambers made said statement, that at the time of making the same his mind was clear and that he knew at the time what he was doing and with such knowledge made it, and that at the time he made it he was suffering from a fatal wound inflicted by defendant upon him

Vol 170 mo—40.

and which wound afterwards caused his death, and that at the time of making such statement, he had given up all hopes of life, and then believed that death was impending and near, then it is your duty to consider it as the dying declaration of said Albert Chambers, and you are to give such dying declaration such weight as you may think it justly entitled to upon a consideration of it, along with all other facts and circumstances disclosed by the evidence in the case. You should consider, however, that such statement was not made in the presence of defendant, that the declarant was not subject to the tests of cross-examination, that the jury had no opportunity to observe the manner of the declarant, and that he was not subject to prosecution for perjury if said statement, or any part of it, was untrue.

"No. 9. The jury are the sole judges of the weight of the evidence and of the credibility of the witnesses; and if the jury believe that any witness has sworn falsely as to any material fact in the case, the jury may, in their discretion, reject all, or any part of, the testimony of such witness."

The defendant further prayed the court to instruct the jury as follows:

"No. 10. The law clothes the defendant with the presumption of innocence, which attends and protects him until it is overcome by the evidence which proves his guilt beyond a reasonable doubt, which means that the evidence of his guilt, as charged, must be clear, positive and abiding, fully satisfying the minds and consciences of the jury. It is not enough in a criminal case to justify a verdict of guilty that there may be a strong suspicion, or even a strong probability of his guilt; but the law requires proof, by legal and competent evidence, of such nature that when it is all considered it produces a clear, undoubted and entirely satisfactory conclusion of the defendant's guilt, and the burden of establishing the guilt of defendant, as above required, is on the prosecution. The reasonable doubt referred to means a substantial doubt of the defend-

ant's guilt, as charged, and not a mere possibility of his innocence.

"No. 11.   The statement read to you as the dying declaration of deceased, Albert Chambers, is to be received by you as such dying declaration.   But because it is a dying declaration you are not bound to believe it.   Dying declarations are admissible only from the necessity of the case and are to be regarded in the light of hearsay testimony and secondary evidence, and you should give such weight to such dying declaration as you believe it entitled to when considered with all the facts proven in the case and in view of the fact that the deceased did not confront the defendant, was not subjected to cross-examination.

"No. 12.   The court instructs the jury that in order to make the statements claimed to be the dying declaration of Albert Chambers competent to be considered by you, it is not sufficient that he may have thought that he might die or that death was probable, or that he might die after a lingering illness, but the statements must have been made in the full belief that his death would be immediate and under full sense that his death was then—at the time he made the statement—impending, and he must at the time he made the statement have no hope or expectation of recovery. And you are further instructed that unless you are satisfied from the evidence beyond a reasonable doubt that the statement introduced in evidence is the dying declaration of Albert Chambers and was made by the said Albert Chambers in view of impending death and after he had given up all hope of recovery, and in the belief that the death was imminent; and in considering the weight to be given such statement, the jury should consider all the circumstances surrounding or connected with the making of such statement; you should consider whether such statement was made in view of impending death, and after the said Albert Chambers had given up all expectation or hope of recovery; you should consider that such statement was not made in the presence of defendant; that the said Albert Cham-

bers was not subjected to cross-examination; that the jury had no opportunity to observe the demeanor and manner of the said Albert Chambers; that the said Albert Chambers was not subject to prosecution for perjury if said statement, or any part of it, was untrue, and that the said Albert Chambers was at the time he made such statement surrounded by friends and sympathizers.

"No. 13. You should consider any threats which you may believe from the evidence were made by the deceased against the defendant and give them such weight in determining the nature of the transaction giving rise to the charge for which the defendant is not upon trial as you may deem proper. Mere threats alone will not justify on the ground of self-defense the killing of deceased; but may be considered by you as tending to show who was the aggressor in the affray.

"No. 14. In considering the question as to whether the defendant honestly believed at the time that he was in danger of losing his life or of receiving great bodily harm at the hands of Albert Chambers, you should take into consideration the circumstances surrounding the defendant at the time, the excitement that he was under, the fear, if any, he was placed in, his condition of mind and all other circumstances and conditions surrounding him.

"No. 15. If Albert Chambers made an assault or attack on the defendant, the defendant was justified in acting upon the facts and circumstances as they reasonably appeared to him at the time, and if the defendant honestly believed that he was in danger of losing his life, or receiving great bodily harm at the hands of Albert Chambers, he would be justified in acting upon such belief and taking such steps as to him seemed necessary to protect his own life or save himself from receiving great bodily harm; even if, as a matter of fact, he was mistaken in believing he was in such danger, and as a matter of fact, he was in no danger at all."

Which instructions the court refused to give, instruction No. 13 being refused on the ground that another instruction on the same subject had been given in lieu thereof, to which refusal of the court to give said instructions thus prayed for the defendant then and there excepted at the time and here saves such exceptions.

As will have been observed, the turning point in this case is what the testimony tended to prove about what occurred at the fatal rencounter. That testimony has been sufficiently set forth. If the State's testimony was believed, the case was one of murder in the first or second degree; if defendant's, an indubitable case of self-defense; and it was for the jury to determine, under appropriate instructions, what degree of guilty homicide, if any, was proven, or whether self-defense; and the verdict on this point is conclusive unless error occurred either in giving or refusing instructions, or in admitting or excluding evidence. But just here, it may not be improper to remark that defendant's statement that Chambers, after being given a mortal wound, shot through the body with a 38 revolver held only a few feet away from him, should shut up the knife and put it in his pocket, seems too improbable for rational belief. And that the knife was found closed in Chambers' pocket, is established by Boseman's testimony.

As to the instructions given for the State, especially when taken in connection with those given at the instance of defendant, they covered every legitimate aspect of the case, and left nothing to be desired. If they have any fault, it is because too favorable to defendant. For illustration, as to the fullness of the instructions, there was one instruction given at the State's request on the subject of self-defense, and *four* on that subject, at request of defendant, and still defendant insisted on another one on that same point being given, which the court very properly refused. And the others refused defendant were also properly refused, either as not stating the law, or as being covered by those previously given.

As to the point that the court did not fully instruct, etc., this point meets its own answer in the fact that defendant did not except on this ground, as was ruled in Cantlin's case, 118 Mo. 100, and many subsequent cases, which have conclusively settled the point adversely to defendant's contention.

Relative to the assertion made by defendant that no instructions should have been given on the subject of murder in the second degree or manslaughter in the fourth degree, there are these things to say in reply: When a homicide occurs, nothing more appearing, presumptively the crime is murder in the second degree. This has been the rule in this State ever since State v. Dunn, 18 Mo. 421; State v. Starr, 38 Mo. 270; State v. Holme, 54 Mo. 153; State v. Foster, 61 Mo. 549, and a multitude of other cases.

And if Chambers used to defendant the opprobrious epithet to which the latter testified, this circumstance would tend to eliminate the element of deliberation from the crime, and thus reduce it to murder in the second degree. [State v. Kotovsky, 74 Mo. 247; State v. Ellis, 74 Mo. 207, and other cases.]

In Alabama it is ruled that where there occurs an *"insult by mere words,"* and this is followed by a homicide, the jury may weigh this with other evidence in order to determine whether the crime be murder in the first or second degree. [Watson v. State, 82 Ala. 10.]

Besides, our statute makes provision that the jury may find a defendant not guilty of the offense charged in the indictment, and may find him guilty of any inferior grade of such offense, and any person found guilty of murder in the second degree, shall be punished according to the verdict, although the evidence shows him to be guilty of a higher degree of homicide. [Sec. 2369, R. S. 1899.]

And section 2535, Ibid, contains a similar provision as to punishment for a lower grade of offense than the one in evidence shows the accused to be guilty of, and prohibits the judgment from being in any manner affected by reason thereof.

Here there were such circumstances in evidence as might have warranted the jury in finding defendant guilty of murder in the first or in the second degree accordingly as they believed some witnesses or disbelieved others. Whereas, according to defendant's contention, an instruction should have alone been given for murder in the first degree. If such an instruction should only have been given in the instant case, and the jury had believed that the testimony showed an entire lack of the element of deliberation, this view would have resulted in defendant's absolute acquittal; a failure of justice that our quoted statutes were explicitly adapted, devised and designed to prevent. [State v. Frazier, 137 Mo. loc. cit. 340.]

In reference to the instruction for manslaughter in the fourth degree, no prejudice resulted to defendant from its giving, because defendant was convicted of a higher grade of crime, as this court on this point has frequently ruled.

Respecting the admission in evidence of the dying declarations of Chambers, it was clearly admissible, and the proper foundation for its introduction was laid. No objection was made at the time of their introduction of the jurat or the affidavit being read in evidence, and the objection made now comes too late. The objection made to the declaration being read in evidence was made to it as a *whole,* and not to any particular portion. This court has repeatedly held that where such general objections are made, attention not being made to any particular matter, and the evidence is admissible for any purpose, it will not consider such objection. The proper mode of making such objection is to point out the objectionable portion and either ask its exclusion (State v. Welsor, 117 Mo. loc. cit. 579) or ask an instruction for its exclusion, and it has been ruled regarding such an instruction that it does not fall within the purview of that section of the statute which requires the court to instruct on all questions, etc., and if it did, as already pointed out, no exception on that score was

saved.    [State v. Westlake, 159 Mo. loc. cit. 678, and cas. cit.]

As to the conversation between Chambers and Dr. Bogard, his physician, about the funeral arrangements of the former, the trial court admitted it as showing the condition of the mind of Chambers; and this conversation occurred after the declaration had been read over the second time to the declarant; and in this there was no error. It might also have been admitted as confirmatory and cumulative evidence of Chambers' firm conviction of his impending death. [State v. Evans, 124 Mo. loc. cit. 409.]

But however this may be, the only objection to this evidence going in, was: "Immaterial, irrelevant and incompetent," which, as this court has so long and frequently decided, is no objection at all.

The last point made by defendant's counsel is the language of one of the attorneys for the State in the closing argument.    He said: "The defense is trumped up by the defendant; Mrs. Henry [who was a witness for defendant] has been brought into court without a subpoena, like a cold deck, and was not subpoenaed until after the trial began, and that is the reason we are not prepared to impeach her.    We did not know that she was going to be a witness."

Whereupon counsel at this point objected to the statement for the reason that there was no evidence before the jury as to when Mrs. Henry had been subpoenaed.    The court sustained the objection, and admonished counsel for the State to confine himself to the record.    This rebuke, in the circumstances of this case we hold as sufficient.    If defendant's counsel did not, they should have asked a more pointed reprimand, which, if the court did not make, should have been made the subject of an exception.    As this was not done, the point is not before us for review.

Finding no error in the record, we affirm the judgment.

All concur.