**STATE of Missouri, Respondent,**

v.

**James (Buddy) WILLIAMS, Appellant.**

**No. 49888.**

Supreme Court of Missouri,

En Banc.

July 8, 1963.

Ward & Reeves, by George K. Reeves, Caruthersville, Dempster & Edwards, by Robert A. Dempster, Sikeston, for appellant.

Thomas F. Eagleton, Atty. Gen., Howard L. McFadden, Asst. Atty. Gen., Jefferson City, for respondent.

DALTON, Judge.

Defendant was charged and convicted of murder in the first degree and the jury fixed his punishment at death. Motion for a new trial was filed and overruled and an appeal taken to this court.

The information filed in the Circuit Court of Pemiscot County on February 5, 1962, charged defendant with the murder of one Brenda Joyce Raines on December 22, 1961, by using a dangerous and deadly weapon, to wit, a shotgun loaded with gunpowder and leaden balls, to shoot and strike her and also by using it as a heavy blunt instrument to strike and beat her to death.

Apparently the defendant was without funds to employ counsel since the court appointed George K. Reeves of the Pemiscot County Bar to defend him.

The cause was thereafter removed on change of venue to the Circuit Court of Scott County, where Robert A. Dempster of the Scott County Bar was appointed by the court to assist in defendant's defense. When defendant was arraigned in the Circuit Court of Scott County, the record shows that, "the prisoner stands mute and says nothing." Thereafter, in view of defendant's refusal to answer with reference to a plea, the court ordered a plea of not guilty to be entered.

Prior to the removal of the cause from the Circuit Court of Pemiscot County, on the application of Attorney Reeves, the court had entered an order for the mental examination of defendant. Defendant was

ordered transported to State Hospital No. 1 at Fulton, Missouri, for such examination, and it was further ordered that copies of the report of such mental examination be furnished to the Prosecuting Attorney of Pemiscot County and to counsel appointed to represent defendant. Defendant remained at the State Hospital No. 1 from March 8 to March 30, 1962, for observation and examination by Dr. E. C. Kepler, a psychiatrist employed at State Hospital No. 1 at Fulton. The defendant was "absolutely uncooperative" while in the hospital. The report showed that, "In view of this patient's complete and persistent uncooperative attitude it is impossible to have an adequate idea of his mental processes." Dr. Kepler, however, testified that: "It was our opinion that he was taking this attitude of muteness, mutism, evasiveness, and alleged amnesia as a defense mechanism, because that is the only defense mechanism that a person of his mental caliber is probably capable of using." The witness further said: "It is my opinion he was not insane when we examined him or when I examined him at my office, and if he was not insane then, he certainly could not have been a few months previous because he shows no signs of mental illness."

Prior to the trial of the cause the court was fully advised by defendant's counsel that, on three different occasions while defendant was in the Pemiscot County Jail, he refused to discuss his case in any manner with appointed counsel and, after his removal to the Scott County Jail, Mr. Reeves and Mr. Dempster made four separate attempts to talk to defendant and he refused to talk to either of them, refused to answer any questions whatsoever. They made diligent efforts to advise him that it was in his best interest to cooperate with his court-appointed attorneys, but he refused to do so. Counsel also asked one Reverend J. M. Blow of the Baptist Church to see and advise the prisoner but the prisoner refused to seek spiritual guidance from either Reverend Blow or any of the members of his church. In this connection

Dr. Kepler found that: "There has been nothing in the behavior of the patient in the hospital nor at the staff meeting to indicate any bizarre mannerisms and although the patient is very definitely socially maladjusted, there is no reason to believe that he is unable to cooperate with counsel in his defense."

Thereafter, the cause came on for trial and a jury of qualified citizens of Scott County was duly selected, after some twenty-five out of some sixty-one veniremen had disqualified on the ground that they were opposed to the imposition of the death penalty in any case.

The State's evidence tended to show that Brenda Joyce Raines was a teenage girl weighing 110 pounds, residing with her family in Holland, Pemiscot County. She was a senior in the local high school and was keeping company with one Frank Craig, a resident of Blythesville, Arkansas. Craig drove a 1961 maroon-colored Pontiac automobile that carried Arkansas license plates. On Friday night, December 22, 1961, one Archer had seen Craig's automobile between 11 and 11:10 p. m. parked on the Denton gravel road, one quarter of a mile north of the blacktop road leading west out of Holland, Missouri. The car, with its lights turned on, was parked headed north on the right-hand side of the road about 100 yards south of a particular tree. This tree was the only one on the road between the blacktop and witness Archer's home. A boy and a girl were observed in the car and Archer had seen Craig and Brenda together earlier in the evening. Archer resided one-half mile farther north on the Denton Road. As he approached Craig's car from the rear, Archer met a colored man about 100 yards south of the parked car, walking south on the left side of the road. Archer's car lights were on and he observed this colored man pull his cap off and bring it down over his face, like he was hiding his face or shading it. The cap was an orange-looking suede cap. The man wore a long light-colored coat and "maybe a tan with tan-looking pants."

Later, after defendant's arrest on Saturday night, December 23, 1961, when the witness entered the police car in which defendant was riding, he observed defendant wearing a similar cap; however, the defendant promptly removed the cap and crammed it in between himself and the car door. The colored man that the witness observed on the road near the mentioned automobile on Friday night, December 22, 1961, was of the same size and build, and had the same complexion as defendant; however, the witness could not "positively identify" the man as the defendant. On Sunday evening, December 24, 1961, at the exact spot where witness and his brother had seen the Craig car on Friday night, the witness observed a pool of blood beside the road, and about 25 yards further north there was a smaller pool of blood, both on the east side of the road.

On Saturday morning, December 23, 1961, about 8 to 8:30 a. m. one Shady George observed Craig's 1961 maroon-colored Pontiac automobile, with Arkansas license plates, parked on a road about a mile and a half east of the Denton gravel road. The car was on the right-hand side of this road, facing east. When the witness returned about 11:30 a. m., driving west and facing this car, he saw a hole in the windshield and, upon examination, saw Craig's body in the car. Craig had been shot in the face and head. There was an old vacant house about 150 to 200 yards west of this car. The house was about fifty feet south of the road. Witness did not disturb the automobile or any part of it, but reported the matter to the sheriff's office in Caruthersville.

There is much conflict in the State's evidence as to whether the location of the car and the vacant house were east or west of the Denton Road, and whether the vacant house was north or south of the road, but these conflicts are immaterial to the issues here.

When Deputy Sheriff Faris arrived at the scene and inspected the car, he found an oval-shaped hole in the windshield and a pool of blood on the ground on the right-hand side of the car. Craig's body was lying in the front seat of the car; the car doors were all closed and the windows rolled up, except that the left front window on the driver's side was one-half or three-quarters rolled down. When Faris opened the left front door of the car he observed that, "All upon the headliner there was [sic] splatters of blood and brains." On the right side of the car was a pair of boy's low-cut moccasins and on the left side a pair of girl's low-cut moccasins. He found some spent "BB" shot in the car. A boy's pocketbook and a girl's pocketbook were lying on the dash of the car, along with other things and wadding from a shotgun shell. "The front recess was full of blood and also the back righthand recess was full of blood." In the girl's billfold was the name, Brenda Joyce Raines, who had been missing from home since the night before. Along the road halfway between the parked car and the abandoned house, the witness observed that the ground was torn up, tracked up and the roadside ditch trampled. From the road, Faris went to the vacant house and observed that there was hair, blood and mud on the screen of a window of the house. Also on the front porch there was blood and mud and an indication that an object had been dragged across the porch. A door facing the road was open and just inside was the naked body of Brenda Joyce Raines. She was lying on her back with her head to the north and her feet toward a closed door. Her clothes had been torn off and were lying on the floor. Her left arm was folded up on her breast and neck, and her left wrist was broken and distorted and her face badly mutilated. There were blood splatters to the right of the body and upon some abandoned lumber and up on the side of the wall of the room. Faris followed the tracks from the porch back to the place where the ground was trampled and torn up along the road. There were two sets of tracks, one deep-cut set leading from the

area to the house and then a set of lighter tracks going back to where the ground was torn up. Between the house and the road there was a place where something had been laid and there was blood and hair there. An impression on the ground appeared in the shape of a body. At this place the witness also found a "spent" shotgun shell, one-half of the stock of a shotgun and some car keys.

Faris also examined the area south of the mentioned tree on the Denton gravel road. According to him the first pool of blood was observed about 130 feet south of the tree and 90 feet further south was a second pool of blood, both on the east side of the road. Another empty 12-gauge shotgun shell was found near the first pool of blood south of the tree. At the same location he observed that automobile tracks had angled off into a small road ditch adjacent to the bean field east of the road.

Defendant was arrested at his home near Holland on Saturday night, December 23, 1961, at about 11 o'clock. The sheriff found defendant in bed and also found some clothes, including a long coat and sweater, boiling in a five-gallon lard can on the stove. He also found a pair of half-knee-length leather boots. He took defendant and these boots with him and the boots were subsequently turned over to Deputy Sheriff Faris.

On Sunday morning, December 24, 1961, Faris saw defendant in one of the cells at the county jail in Caruthersville and showed him the boots taken by the sheriff and "asked him [defendant] if those were his boots." "He told me that those were his boots." There were no promises, threats or mistreatment of defendant before the boots were exhibited and the question asked and the answer given. Faris then took the boots and compared them with the tracks seen in the area of the vacant house and the car containing Craig's body. The heel of the boots had a peculiar design and Faris compared the heel with the heel tracks that were in the road, in the ditch and in the field near the vacant house. The tracks were exactly the same width and length as the boots, and the boots fitted the tracks perfectly. The heel prints showed exactly the same heel design as the boots. About a half a quarter north of the east-west gravel road on which the car was found, Faris found such tracks again going out into the field around what is referred to as the Archer place. He also tested these tracks with the boots from time to time, and the tracks were of the same design. He followed the tracks through a field across a ditch that had a bridge on it and then south to where the tracks turned east, and he followed these tracks on east a half a mile into defendant's yard. On the same trip he compared the boots with tracks made on the Denton road south of the mentioned tree. He noted that the tracks left the road and went out and around the tree and approximately out twenty feet into the bean field before they headed back into the road. Witness also noted that the tracks again left the road and made a half circle in the field and came up to the road approximately thirty feet south of the pool of blood that was furthest south of the tree. This was the location where Archer had observed the Craig car parked the night before. Faris also observed automobile tire tracks by the south pool of blood on the east side of the Denton Road and then down the road to the north to where the tracks angled off into the road ditch near the north pool of blood. At one place the car had apparently been backed up a short distance. All of the area inspected by Faris was located in Pemiscot County.

On Saturday evening, December 23, 1961, in the Pemiscot County Memorial Hospital at Hayti, Missouri, P. J. Aquino, M.D., of Caruthersville, Missouri, examined the body of Brenda Joyce Raines. He observed that her head and face were badly mutilated and showed evidence of traumatic blows and injuries primarily to the head, although the body was "covered pretty well in blood from head to foot." There was evidence of a lick in the back of the left ear as well as evidence of a lick back of the right ear and

one in front of the left ear. "On taking hold of her chin and face, all of the bones were evidently broken in many pieces of the entire face and chin." Apparently these injuries could have been made by severe blows with a blunt instrument and in his opinion they were so made. He also observed that the deceased had a gunshot wound in the front and outside part of her right arm but he did not consider that injury fatal. With a reasonable degree of medical certainty he was able to say that, in his opinion the cause of deceased's death was either one of the three wounds on the head which he had previously described. Any one of the three could have been lethal or death-causing. He also made an examination of her "female genital tract and found male sperm cells present." The witness subsequently observed defendant in the Pemiscot County Jail on several occasions within a few days after his arrest. He noted that defendant sat perfectly calm, and that he appeared to be in a melancholy condition. In talking to and viewing the defendant, he observed that defendant's actions were perfectly normal.

The evening the crime was discovered, December 23, 1961, Sgt. Hickman found the lower part of a gun butt between the parked car and the vacant house. As stated, a half of a gun stock was found the next day by Deputy Sheriff Faris in the same area. A large number of officers and others made a wide search, both Sunday and Monday, for the barrel part of the gun, but it was not found until late Monday evening when defendant personally pointed out the location, and the breach, barrel and forearm of the shotgun were recovered. The gun barrel had been bent and was muddy and there was some hair in the trigger. The top, where the hammer was located, was packed with flesh, hair and mud.

After defendant's arrest he was taken to Cape Girardeau for some purpose, but it is impossible for us to determine from the record when defendant was taken, because there is so much conflicting testimony with reference to the matter, including testimony by witnesses who admittedly had no first-hand knowledge of the facts, but, nevertheless, defendant's counsel was permitted to lead them to admit alleged facts of which they repeatedly said they had no personal knowledge. From the record, the court and jury could have found that four officers took defendant from Caruthersville to the police station at Cape Girardeau, and that they left Caruthersville at midnight Saturday night, December 23, and returned on Sunday, December 24. The evidence is conflicting as to whether they returned at 7 a. m. Sunday or at midnight Sunday. There was other evidence that defendant was not questioned until midnight Sunday night. There was evidence that defendant was not questioned Sunday, December 24, and that the officers took him to Cape Girardeau, leaving Caruthersville at midnight Sunday night and returning at 7 a. m. Monday.

The State, however, takes the position that at 12:01 a. m. Monday, December 25, defendant was taken by airplane to Cape Girardeau. He was returned to Caruthersville at 7 a. m. the same morning (Monday, December 25, 1961). There is nothing in the record to show what occurred during this seven-hour period. There is no evidence upon which any inference can be drawn except that the defendant did not appear to be tired at 9 a. m. Monday morning. There was no affirmative evidence as to how much defendant slept or could have slept Sunday night and no evidence that he had breakfast Monday morning; however, the evidence shows that breakfast was served in the jail usually around 7:30 to 8 a. m. There was testimony that, at the time questioning was commenced defendant did not appear to be worn out, tired or sleepy.

State Highway Patrolman Mobley started the questioning of defendant at 9 a. m. Monday. All questioning took place in the presence of Richard Pankey, Deputy Sheriff of Pemiscot County, who first saw defendant that day. He talked with defendant intermittently during that day and defendant was left alone part of the time. Defendant was permitted to go to the rest

room once or twice, had coffee several times and was provided with some hamburgers, and he ate hamburgers and drank Coca-Cola, stood up or sat down at his own pleasure, and smoked Camel cigarettes. There is no evidence in the record to the contrary. There was no violence of any kind towards the defendant and, more or less, one person at a time talked to defendant. With the exceptions noted below, the questioning was conducted throughout in the identification room of the sheriff's office in Caruthersville. This room and the sheriff's radio room are separated by a hallway. There is a glass partition between which permits full view into the room.

The defendant was questioned for about an hour and a half by Patrolman Mobley in Pankey's presence. No one else was in the room. Apparently no information was obtained, since defendant said he could not remember what he had done Saturday night. When asked if he had done certain things, he didn't deny them but said he couldn't remember.

When Mobley left at 10:30 a. m. Pankey continued the questioning alone. As to the procedure employed, Pankey stated that the manner in which the questioning was conducted was mainly discussing with defendant the things that the officers had found, the evidence concerning the footprints and so forth and so on.

Shortly after noon on that day, December 25, defendant made admissions concerning the shotgun, and claimed that a boy had stolen it for him. The boy was sent for and the questioning was discontinued while he was being brought from Holland to Caruthersville. When confronted with the boy, who denied the charge, the defendant admitted, at 1 p. m., that he and not the boy had procured the shotgun. This led to further questions about the gun and, after further intermittent questioning ("Off and on") through the afternoon, led up to a full oral disclosure at 7 p. m. When defendant told his story as to what the facts were, the full story was not told at once.

"It was more or less a one thing at a time process * * * by no means was it just one continuous recitation of the facts. It was a thing drawn out over the biggest part of the afternoon of the day." During the afternoon Highway Patrolman Lancaster had joined Pankey in the questioning. After full disclosure at 7 p. m. of the alleged facts and a statement given as to the location of the gun barrel, Pankey and Lancaster asked two other officers to come in and listen because they could not understand, from the description given by defendant, where the barrel of the shotgun had been hidden. Defendant offered to point out the place and at 8:30 p. m. he was taken to the scene to assist in locating the gun. After the gun barrel was located defendant was returned to the sheriff's office at 10:30 or 11 p. m.

After the defendant had rested an hour or so, the sheriff suggested that Pankey obtain a written statement from the defendant.

About midnight on Monday, December 25, 1961, Pankey first mentioned the matter of a written statement to defendant. Pankey had not previously discussed any constitutional rights with defendant and he didn't think that Mobley had either. They had questioned the defendant about the gun and the footprints and other matters, but so far as the record shows the defendant's constitutional rights were not discussed with him at any time prior to the time he orally told his full story to Pankey and Lancaster on Monday evening, December 25, 1961, before 7 p. m.

When the matter of a written statement was presented, Pankey told defendant he could have an attorney if he wanted one and his constitutional rights were fully discussed with him as shown by the written confession. He said he didn't want a lawyer. He was also told that he didn't have to make a statement unless he wanted to. So far as Pankey knew defendant had not been questioned by anyone unless he (Pankey) was present. There were no threats or prom-

ises, mistreatment or violence of any kind. Pankey just told defendant he would like to have a written statement and defendant said he would give it. After the statement was given the defendant was permitted to make any changes, additions, deletions or corrections he desired and he made some corrections and signed it. The writing, correcting and signing of the statement was not completed until 3 a. m., Tuesday, December 26, 1961.

Appellant's brief states that: "There is no contention in the record of this case that the appellant was given any promise of [sic] hope of leniency or reward to make said confessions and it is not contended that the prosecuting authorities made any threats or did any physical violence to the appellant. There is absolutely nothing in the record to show or to indicate that any promises were made to the appellant or that he was threatened, or that he was subject[ed] to any physical violence * * *."

Briefly, defendant's oral statement to Pankey substantially conforms to the written statement. Defendant stated that, on Friday, December 22, 1961, he went to the house of "Kid" Wheaton, who lived next door to defendant's house on a gravel road northwest of Holland; and that he broke the window glass out of a window, raised the window, went inside and got a shotgun and three shells. He took them to his house and hid them under his front porch. After it got dark that day he moved the shotgun and three shells and hid them in a bean field near the gravel road that runs west of his house. Sometime after 9 o'clock that night, while walking south on the gravel road west of his house, he decided to go out and take the gun from the bean field. At that time he didn't see any cars, but, after he got to the place where the gun and shells were hidden, he looked back and saw that a car had stopped on the road just south of the tree. He could see the car, but the car lights were not on. He then walked down "the turn row" to where the car was parked and walked out in the field and started around the car. At that time the man in

the car rolled down the glass on the driver's side and cursed defendant and defendant shot at the man through the window on the driver's side of the car. (Other evidence, as noted, tends to show the car was facing north, with the driver on the west side and the bean field and tree on the east side of the road and that Craig was shot from the rear and through the open window on the west side of the car.) After the shot was fired, defendant said he then *ran* around in front of the car, reloaded his gun and shot through the windshield towards the driver. Only two shots were fired. He then went to the driver's side of the car and told the girl to drive the car to the next corner north and turn left and drive on to the old empty house and past the house and then stop. At first she backed up a ways and then drove the car to the place he had told her, which place was about 200 yards west of the old vacant house; that he then took her across the ditch toward the old house and when about half way he hit her with the gun two or three times, once on the side of the head and then twice more. He then carried her about half way to the house and put her down and laid the gun down and again carried her to the front window of the house and tried to put her through the window, but there was a screen across it, and he laid her on the porch and then dragged her across the porch into the house. In the house he removed her clothing and had sexual intercourse with her. After that he went and picked up his shotgun and walked back along the edge of the bean field and on to his home, and reached his home before day. He thought he had left the old vacant house about midnight. Defendant's oral statement was completed about 7 p. m. on Monday, December 25, 1961.

After the trip to recover the gun barrel and after the return to the jail and after defendant had rested, the statement was reduced to writing.

Defendant did not testify at the trial nor offer any evidence except that one of his attorneys testified concerning an attempt to get defendant to talk to them. The truth of

the facts stated in the oral and written confessions, therefore, was not questioned by defendant's evidence and its weight and value was for the jury.

While appellant's brief contains thirteen assignments of error under points and authorities, the appellant admits that these assignments, "generally speaking," fall into three broad categories, the first of which appellant says is based upon the continual and repetitious manner in which the State, through its prosecuting attorney and assistant prosecuting attorney, injected into the case the facts with reference to the two other separate and distinct crimes, to wit, the murder of Frank Craig and the rape of Brenda. As to this category appellant says that the well-established general rule is that the proof of the commission of a separate and distinct crime is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which it is on trial; and that the continued reference made by the State to these separate and distinct crimes and the testimony given by the various witnesses "was wholly unnecessary to prove the State's case," and was highly prejudicial to defendant.

In support of the contention that the court erred in admitting evidence of the other crimes, the appellant cites and relies upon the following cases: State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307; State v. Medley, 360 Mo. 1032, 232 S.W.2d 519, 524–525 [6–9]; State v. Shilkett, 356 Mo. 1081, 204 S.W.2d 920, 922–923; State v. Griffin, Mo.Sup., 336 S.W.2d 364, 367. These cases only review some general rules of law which are not in question. The cases are not at all similar on their facts. In State v. Reese, supra, 274 S.W.2d 304, 307, the court said:

" 'The well established general rule is that proof of the commission of separate and distinct crimes is not admissible, unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. * * * Evidence of other crimes, when not proper-

ly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted.' State v. Shilkett, 356 Mo. 1081, 204 S.W.2d 920, 922–923. Exceptions to this general rule of exclusion are as well established as the rule itself. On this point this court has twice cited approvingly, State v. Buxton, 324 Mo. 78, 22 S.W.2d 635, 636, and State v. Spinks, 344 Mo. 105, 125 S.W.2d 60, 64, [and] the following from People v. Molineux, 168 N.Y. 264, 61 N.E. 286, 294, 62 L.R.A. 193: 'Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial.' "

The points relied upon by appellant in the first group of assignments of error were properly raised at the trial by objection to the mentioning of these other crimes in the State's opening statement to the jury, by objections to testimony tending to show the murder of Craig and the rape of Brenda, and by objections to the State's opening and closing arguments to the jury with reference to this evidence of other crimes. Appellant's theory is that the proof of any facts tending to show the murder of Craig and the rape of Brenda was wholly unnecessary to proof of the charge that appellant murdered Brenda; and that the testimony tending to show these other crimes was not a part of the res gestae attending her death, and hence were inadmissible. Appellant particularly objected to the testimony concerning the automobile; the condition of its interior; the presence of Craig's body therein; and the evidence that Brenda was raped. Appellant says that Brenda was not murdered nor harmed in the automobile.

Objection was also made to a part of the testimony of Dr. Aquino on the ground that the evidence "conclusively" showed that Brenda was *dead* before she was raped.

Apparently the appellant would limit the State's evidence to evidence showing the murder of Brenda at the place where two pieces of the gun stock were found and where the ground was trampled, although the defendant admitted that the second shot was fired through the windshield of the car while it was on the Denton Road and the evidence showed that Brenda was there and was shot in the right arm.

■ We have carefully considered the first ten assignments in appellant's brief which, as stated, relate to the admission of evidence concerning the death of Craig and the rape of Brenda. The same issues are presented in the motion for a new trial and in the argument in the brief. If the mentioned evidence was properly admissible, as we think it was, there was of course no error in permitting the State to review it before the jury, as being evidence which the State expected to prove, or in reviewing it in argument before the jury after the evidence was in the record. We think the evidence shows a single continuous transaction for a single purpose. The facts concerning the murder of Craig and the rape of Brenda were so closely inter-related to the proof of the murder of Brenda that they could not be separated from the other facts. The jury could find that the single purpose was to rape Brenda. This motive brings all other facts into a single unified transaction. The evidence of these other crimes was admissible as a part of the res gestae, as acts and events surrounding the murder and so closely related to the murder, as to be a part of the same transaction. State v. Gentry, Mo. Sup., 212 S.W.2d 63 [2, 3]; State v. White, Mo.Sup., 301 S.W.2d 827, 828 [4, 5]; State v. Childers, Mo.Sup., 313 S.W.2d 728, 733 [10]; State v. Swinburne, Mo.Sup., 324 S. W.2d 746, 753 [9].

The jury could believe and find that the gun and shells were obtained and hidden in the bean field adjacent to the road for the purpose for which they were used, to wit, to kill Brenda's male companion and to so prevent interference; that the second shot was directed through the windshield to prevent Brenda's escape with the car; that after the second shot was fired through the windshield the car went into the roadside ditch and defendant took control; that after the car reached the vicinity of the vacant house Brenda was removed from the car and taken to the vacant house for the sole purpose of raping her; that some difficulty was encountered on the way; and that she was beaten with the gun and carried into the vacant house where she was again beaten either to subdue her so that defendant could accomplish his purpose or to prevent her testifying against him and so he could escape detection and punishment. There were splashes of blood to the right of the body on the floor, also on the stored lumber and on the wall of the room. This evidence is not accounted for on any other theory other than to make sure Brenda was dead before or after the rape.

■ Further, the evidence as to the other crime which was directly connected with the crime charged was relevant and material to proof of murder in the first degree since premeditation, deliberation and malice could be inferred from the circumstances attending Brenda's death. State v. Kenyon, 343 Mo. 1168, 126 S.W.2d 245, 249 [3, 4]; State v. Nolan, Mo.Sup., 316 S.W.2d 630, 633 [2, 3]; State v. Small, Mo.Sup., 344 S.W.2d 49, 53 [2]; State v. Cade, 326 Mo. 1132, 34 S.W.2d 82, 84; State v. Goodwin, Mo.Sup., 352 S.W.2d 614, 620 [5], certiorari denied, 371 U.S. 915, 83 S.Ct. 262, 9 L.Ed.2d 174.

■ Appellant also assigns error on the court's action in permitting the assistant prosecuting attorney, in his opening statement, to tell the jury that, when arrested, the defendant was "boiling blood" out of his clothes. Appellant says that the assistant prosecuting attorney promised he would tie that fact up later, but he did not do so. Appellant overlooks the fact that the evidence shows Brenda's body was covered with blood from head to foot; that the defendant's admission shows that he had car-

**418**

ried Brenda to the house from a point half-way between the car and the vacant house; that he had tried to put her in the house through a screened window; and that he dragged her into the house and raped her. Appellant also overlooks that the evidence shows the colored man seen on the road near the car wore a long coat; and that a long coat and a sweater were being boiled in a five-gallon lard can on the stove when defendant was arrested. There was also evidence that the tracks from the trampled place to the vacant house were much deeper than the same set of tracks returning to the road. The jury could, of course, assume there was some reason for the defendant boiling the coat at 11 p. m. Saturday night, December 23, and could further find that Brenda could not have been carried by defendant in her injured condition without the defendant getting blood on his clothing.

Appellant's next assignment is based on the theory that both the oral confession and the written confession were *extracted from defendant by mental coercion on the night of December 25 and the early morning hours of December 26;* that the State failed to prove that the confessions were voluntary; and therefore the court erred in allowing these confessions to be introduced into evidence.

■■■ Appellant's counsel in their brief refer to appellant as an uneducated Negro, approximately thirty years old, and say that "The actual facts are that the appellant has the low intelligence of the usual cottonfield working Negro in Pemiscot County, Missouri." We find nothing in the record to support these statements as to age, education and intelligence unless the testimony of Dr. Aquino supports an inference on the last point. However, the defendant being in custody, the burden of proving the voluntariness of the confessions rested upon the State. State v. Bradford, Mo.Sup., 262 S. W.2d 584, 586 [1–5]; State v. Statler, Mo. Sup., 331 S.W.2d 526, 530 [7–9]. Whether the confession was voluntary or involuntary depended to a large extent upon the

person from whom such confessions were obtained. His age, education, experience and intelligence were necessarily involved when determining whether the confessions were voluntary or coerced. State v. Barnett, Mo.Sup., 338 S.W.2d 853, 856 [3]. A confession exhorted by mental punishment is as incompetent as one obtained by physical punishment. State v. Bradford, supra, 262 S.W.2d 584, 586; State v. Barnett, supra; State v. Ellis, 354 Mo. 998, 193 S.W.2d 31, 34 [4], certiorari denied, 328 U.S. 873, 66 S.Ct. 1374, 90 L.Ed. 1642.

The objection to the State's evidence concerning the oral admissions of defendant was, as follows: "Yes, we are going to object to this witness testifying and narrating what was said for the reason, Your Honor, that this witness [sic] had not been given an opportunity to sleep the night before and that *he was under duress* by virtue of the fact that he hadn't been given an opportunity to sleep. He had only had, we will say, a hamburger or so to eat in some 36 hours, *and anything he might say certainly would not be voluntary under that situation.* By this witness' own testimony he stated that this defendant was taken with patrolmen who were armed with guns, taken to Cape Girardeau, kept until 7:00 o'clock the following morning and then interrogated all that day and then half of the next day or next until three o'clock in the morning. We think that violates this man's constitutional rights, and any confession wouldn't be voluntary under those circumstances and the Court so holds." (Italics ours.)

The only objection interposed to the admission of the written confession into evidence was, as follows: "We object to it for the reason the statement was taken some 24 hours—* * * after the man was awakened from his sleep and was not permitted to sleep and was given food at one occasion and was continuously interrogated from the time beginning the morning at 9:00 A.M. until this statement was taken, and reduced to writing beginning at midnight of the following night, the following day; therefore,

it is not voluntary for the reason this man had no rest and had no opportunity to get any rest."

The court overruled these objections to the oral and the written confessions.

The objections made do not conform to the undisputed testimony of witness Pankey that all of the oral confession was made between 1 p. m. and 7 or 7:30 p. m. December 25, 1961, nor do the objections made conform to the undisputed evidence as to the manner in which the questioning was conducted and the circumstances attending it.

■ It is true that there was much conflict in the evidence as to what took place between 12 p. m. Sunday night and 7 a. m. Monday, but no conflict as to what happened between 9 a. m. Monday and 3 a. m. Tuesday. There was clearly an issue of fact as to whether the oral and the written confessions were voluntary or whether they were involuntary and obtained by mental coercion by reason of lack of rest, sleep, food and continuous questioning. The issue was for the jury and the court did not err in overruling the particular objections. State v. Smith, Mo.Sup., 310 S.W.2d 845, 851 [8, 9], certiorari denied 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231; State v. Butts, 349 Mo. 213, 159 S.W.2d 790, 791 [1], 140 A.L.R. 1177.

Another objection to the admission in evidence of both the oral and the written confession does not appear in the transcript of the record and no assignment of error is based upon it, but the matter is presented in the printed argument in appellant's brief, as follows:

"In addition to the long protracted interrogation the appellant was unlawfully detained under Section 544.170, R.S.Mo.1959, for more than 20 hours, under arrest, without a warrant. The record is clear that the appellant was arrested at 11:00 P.M. on December 23, the oral confession was extracted from him on December 25 at 7:00 or 7:30 P.M., and the written confession was extracted from him at 3:00 A.M. on December 26. The complaint against this appellant was not filed in the Magistrate Court of Pemiscot County, Missouri until December 26, 1961, and a warrant for the appellant was not issued until that date. In addition, the appellant was not arraigned before the Magistrate Court until January 2, 1962."

At the request of this court a certified copy of the warrant for defendant's arrest has been filed here and it shows that it was issued on December 27, 1961 and was served on defendant on the same day. A certified copy of the transcript filed by the magistrate in the circuit court in this cause recites that the complaint was filed on December 26, 1961 and a warrant issued on the same day and that, thereafter, the defendant was arraigned on January 2, 1962.

Appellant relies upon Watts v. State of Indiana, 338 U.S. 49, 57, 69 S.Ct. 1347, 93 L.Ed. 1801; Turner v. State of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815; Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; State v. Powell, 258 Mo. 239, 167 S.W. 559; State v. Ellis, 294 Mo. 269, 242 S.W. 952, 24 A.L.R. 682 and State v. Thomas, 250 Mo. 189, 157 S.W. 330. These cases in view of their facts are not controlling here.

■ However, the present rule in this state is that, the fact that a peace officer violates the state statute by failing to release a prisoner in the time prescribed by the statute without having him charged with a criminal offense within the time specified does not, as a matter of law, render the prisoner's confession involuntary. See State v. Lee, 361 Mo. 163, 233 S.W. 2d 666, 668[1, 2]; State v. Francies, Mo. Sup., 295 S.W.2d 8, 12 [8, 9]; State v.

Smith, supra, 310 S.W.2d 845, 851[8,9], certiorari denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231; State v. Bridges, Mo. Sup., 349 S.W.2d 214, 218[3]. And see State v. Barnett, supra, 338 S.W.2d 853, 857.

Appellant's final assignment is that the court erred in giving State's Instruction No. 7 because "under this instruction the jury would have to find that the confessions were *valid,* irrespective of the mental coercion performed on this Negro by the long period of interrogation without sleep and without food." Appellant further says that "this Instruction failed to include in the definition of 'voluntarily', the mental coercion of this Negro as a result of the browbeating, sweating and long hours of interrogation without sleep or proper food." Appellant also complains that Instruction 7 "fails to require the jury to find that either the oral or written confessions given by the appellant were, in fact, true"; and that the instruction permits the jury to consider both confessions, even though the jury might believe and find that the facts stated in the confessions were not, in fact, true.

Instruction No. 7 is, as follows:

"The Court instructs the jury that before any alleged statements can be valid, and before you can even consider them, they must have been made voluntarily, that is to say, without anyone having offered to the person who is claimed to have made such statements any hope of leniency or reward of any kind for making such statements, and without anyone making any threat or doing any violence to the person claimed to have made any such statements in order to induce or force him to confess.

"If the jury does not believe that statements, claimed to be a confession made by the defendant were made by him, or even though made, were not voluntarily made by him as defined above, the jury should entirely disregard such statements in arriving at your verdict.

"If, however, the jury does believe beyond a reasonable doubt that statements, claimed to be a confession were made by the defendant, and were voluntarily made by him as defined above, the jury may consider such statements and you should give them such weight, if any, as you believe they deserve in arriving at your verdict. Given M. C."

Respondent insists that the record in the instant case shows no facts "on which the jury could have found that appellant was subjected to mental coercion"; and that in the absence of such evidence the court had no duty to submit the issue to the jury. We think the evidence reviewed was sufficient, and particularly so since defendant was in custody and the burden rested on the State to show the confessions were voluntary. Respondent further argues that "no request was made by appellant" that the issue of mental duress and coercion be included in Instruction No. 7 on the issue of voluntariness. That duty did not rest on appellant. Respondent also cites State v. Stidham, Mo. Sup., 305 S.W.2d 7, 17, where a similar instruction was approved, but the facts were different.

■ It has been noted that the objections to the oral and written confessions were based upon the theory that interrogation of defendant was continuous and extended over a long period of time, and that the defendant had not been permitted to sleep, rest or have proper food and drink and, therefore, that the confessions were obtained by duress and mental coercion. While, as stated, the evidence on some of these matters was conflicting, the issue was for the jury and the issue of mental duress and coercion had to be decided in order to determine whether the confessions were or were not voluntarily given. No such issue was presented to the jury by Instruction 7 or any other instruction. In omitting to present the issue of mental duress and coercion for determination by the jury, the instruction was clearly erroneous and should

not have been given. We find no merit in the other contentions.

The judgment is reversed and the cause remanded.

All of the Judges concur except HOLMAN, J., not sitting.