**STATE of Missouri, Respondent,**

v.

**Orville Hubert LINDER, Appellant.**

**No. 52276.**

Supreme Court of Missouri,
Division No. 2.

March 13, 1967.

Lewis E. Pierce, Robert G. Duncan, Pierce, Duncan, Beitling & Shute, Kansas City, for appellant.

Norman H. Anderson, Atty. Gen., Jefferson City, Glen C. Schomburg, Sp. Asst. Atty. Gen., Kirkwood, for respondent.

BARRETT, Commissioner.

Charged with burglary in the second degree (RSMo 1959, § 560.070, V.A.M.S.) and a prior felony conviction (RSMo 1959, § 556.280, V.A.M.S.), a jury found the appellant Orville Linder guilty as charged and, after a hearing on allocution, the court fixed his punishment at seven years' imprisonment.

His first point is that the court erred in permitting the state to amend the information "after trial commenced to change the allegation that appellant had previously been convicted in Jackson County to an allegation that he had been previously convicted in Polk County." In short, in charging a prior felony conviction of grand stealing the state had alleged that the conviction was in Jackson County, the fact was that this particular conviction was in Polk County, not Jackson, and accordingly the state asked and was given permission to amend the information by striking out the word "Jackson" and interlining the word "Polk." There would be no point to elaborating on his claim that this amendment violated both his constitutional right to know and "demand the nature and cause of the accusation" (Const.Mo.1945, Art. 1, § 18(a), V.A.M.S.) and the rule and statute permitting amendments "if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." Criminal Rule 24.02, V.A.M.R.; RSMo 1959, § 545.290, V.A.M.S., and see RSMo 1959, § 545.030, V.A.M.S. On more than one occasion it has been held that the state may amend an information and for the first time allege a prior felony conviction, State v. Wilson, Mo., 349 S.W.2d 934; State v. Ninemires, Mo., 306 S.W.2d 527. And as long ago as 1922, upon a charge of shooting craps, even after the jury had been empanelled and a witness sworn, it was held not to be erroneous or prejudicial to permit an amendment to the information inserting the name of the county. State v. Wright, Mo.App., 236 S.W. 395; State v. Flores, 332 Mo. 74, 55 S.W.2d 953. In addition when against the advice of his lawyer the appellant insisted on testifying he admitted five prior felony convictions in at least three states, he wanted to "stipulate I have got a bad record. I have done a lot of time, but I can tell the truth."

The appellant's second point is that in violation of his rights under the Fourteenth Amendment and Art. 1, Sec. 10, Constitution of Missouri, his *"conviction* was *based in part* upon the admission in evidence of alleged *oral statements* made by appellant to *police officers,* said *statements having been coerced,* involuntary and the results of threats, therefore requiring a reversal of said conviction." (Emphasis supplied, particularly for future reference.)

This claim of coerced "statements" and invasion of constitutional safeguards is made in the face of these incontrovertible facts and circumstances: Edward Morgan is the principal owner of the Morgan Supply Company, a wholesaler in plumbing supplies, 903–905 Truman Road and 1509–15 Campbell Street. He had been on a month's vacation and on September 19, 1964, a day when the business was closed, he went "down there Saturday morning, quiet, and was trying to clean up my work." Because of prior burglaries an "electronic eye" burglar system, with an alarm on the outside of the building, had been installed. While Morgan was working in his second-floor office, about 4:30 in the afternoon, the burglar "siren" went off. His desk was near the stairwell and when he looked down the stairway he "saw this man (the appellant Linder) down at the bottom of the stairway in the electric eye." And he said "without giving it a second thought, I run downstairs and grabbed him, and pulled him away from the electric eye and twisted his arm up behind his back, and I marched him upstairs and called the police." And, "while I had his arm twisted behind his back there, I asked him then what he was doing in the building, and he said he was in there to open the doors to let somebody in with a truck to take some material out of there."

The first officers to arrive were two patrolmen, Mr. Morgan had Linder "in custody" so they handcuffed him and without investigating "placed him in the wagon." Officer Reed of the burglary unit arrived in a few minutes, "introduced myself to the defendant," took him out of the paddy wagon and, before anything and all else, "told him that since this case would probably be going to court he didn't have to tell me anything about what had happened or what he did unless he wanted to, and it was his right to a lawyer if he so desired. * * * I told him that it was his right to call a lawyer, and that he didn't have to tell me anything, and that since this case was going to court, anything he told me could be used up there against him. I could use it against him."

They returned to the building and Officer Reed continued, all without a single objection by counsel experienced in criminal law, "I said there is a few things I would like to know, especially how you got in here, into the place, and what you intended to do. He told me that he first started to go through the window, the back window off the roof to get into the place, but there was iron bars across the window, and he decided this would be a little too hard so he tore a hole in the boards next to the window; that he went in and dropped down onto some pipes, then went over and pried a bar off the inside of the front door and turned the snap-type lock on the inside of the door to allow it to be opened from the outside. Then he went over to the overhead door just north of this front door, and as he was standing just inside the door he set off the alarm, which is a siren, a siren-type alarm outside. And he told me that there was—his partner by the name of Biddie, he didn't know his full name. * * * He said that his partner had dropped him off there, and that his partner was supposed to take his car to the area of 30th and Harrison and pick up a truck and bring it back to 1509 Campbell, and they were going to load the truck with the materials, and that they were supposed to split whatever they got for these materials."

Prior to Saturday the doors and windows had been locked and the building made secure, and investigation revealed that where the back of the building dropped "down to a one-story building" there was an "up-and-down place along the back side

of the building approximately four feet high, and there had been a hole torn out of this." Mr. Morgan described the hole as "three foot by three foot," large enough to admit a person, and as to Linder, he said, "I don't know how he come in, except there was a hole in the roof." Officer Reed said that Linder took him around to the south side of the building and pointed out how he had climbed up a pipe onto the one-story roof and then through the hole which he described as sixteen by sixteen inches. The police found a pinch bar, "strange" to Morgan, near the front of the building.

Upon this evidence the state rested its case. Only Officer Reed testified to any "statements" or oral admissions by Linder, there was no written statement and none was requested. The only patrolman who testified, Hannah, did not testify to any incriminating statements by Linder and there was no indication in defense counsel's cross-examination that there was to be a claim of threats or of coerced "admissions" or "statements." On cross-examination Officer Reed again said that he advised Linder of his right to remain silent and to counsel. He said that Linder was already under arrest and handcuffed when he arrived, he did not remove the handcuffs and was there and talked to him 30 to 45 minutes. The only questions germane to the claim of coerced statements were these:

"Q. So his hands were like this (indicating), handcuffed in back of him?

"A. Yes.

"Q. Did any other officers accompany you and this defendant on his tour of showing you around?

"A. The other officers were in and around the building.

"Q. But they were not with you?

"A. No, they didn't go with me, specifically.

"Q. In your presence, Detective Reed, were any threats of violence or anything else made against this defendant if he didn't confess?

"A. No.

"Q. You, of course, didn't make any threats of this kind, did you? A. No."

There was no request to examine Officer Reed preliminarily to inquire into the circumstances in which he conducted his investigation. These were the only questions or other indication that there was to be a claim of coerced "statements." As stated, throughout the trial there was no objection to Reed's testifying to Linder's oral statements or admissions and except as may be inferred from the cross-examination no claim of coercion or improper invasion of the right to remain silent. In short, up to this point in the trial, that is at the conclusion of the state's evidence, there was no direct claim by appellant's counsel of coerced admissions or the invasion of any constitutional right and there was no evidence from which it was a fair or permissible inference that there had been any threats or coercion, either physical or psychological, that would require the court as a preliminary matter to consider and determine whether any statements Linder may have made to Reed were voluntary or involuntary.

In support of his assignment of error with respect to involuntary "oral statements" the appellant cites and relies upon State v. Williams, Mo., 369 S.W.2d 408; Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872; and State v. Beasley, Mo., 404 S.W.2d 689. And the following should be added to this list of cases: Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 and more recently Sims v. State of Georgia (January 1967) 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 and O'Con-

nor v. Ohio, 385 U.S. 92, 87 S.Ct. 252, 17 L. Ed.2d 189. And it is assumed for the purposes of this opinion, whether they operate retroactively or prospectively,[1] that these cases are binding and applicable if the evidence and reasonably permissible inferences support a claim of coerced statements and therefore demand at some stage of the trial a finding by the court whether in the totality of the circumstances (State v. Beasley, supra) the "custodial interrogation" (Miranda v. State of Arizona, supra) infringed constitutional safeguards.

As indicated, Linder against the advice of his counsel insisted on testifying because, as he volunteered, "these people have not heard my story, that is why I agreed for you to bring all this stuff out. We want to hear the facts in the case, I think. That is the only way we are going to get them." And so on direct examination he said that he was present in the Morgan Roofing Company as Mr. Morgan testified, but he explained: "I had just been relieved from Kansas State Penitentiary a short time before that. I was busted. I needed money. A guy offered me work at fifteen bucks a load—excuse me. * * * To help him move his place to another place over the weekend. He said he didn't want his workers coming in on Monday and him having to pay somebody show-up time and so forth. * * * All I knew the man was called Biddie." And he says, "I got in the truck" and he drove down in the alley "and he opened the door, and he said 'Go around in behind the counter' * * * and he said 'punch the button for the overhead door, and I will back the truck in at the loading dock.'" And he testified that while he was at the door "this gentleman that gave testimony here, Mr. Morgan, walked down the stairs, and he said, 'What are you doing in here?'" Whereupon Linder told Mr. Morgan about

his employment by Biddie, who apparently vanished.

The only possible way to fully appreciate Linder's claim of unconstitutional threats and coercion is to quote at length from his testimony, all, it must be remembered, in the argot of penal institutions. On direct examination he said that he walked up the stairs with Morgan (he denied that Morgan twisted his arm and forced him) who called the police, and then he said:

> "After the police got there, there was some big officer in uniform (Hannah, no doubt), he put handcuffs on me, and he sat down on them real tight. Put them behind my back, and cut all my circulation off.
>
> "Q. What do you mean, 'sat down on them?'
>
> "A. I mean he put his knee on the cuffs and put them up as far as he could. It is a pretty miserable predicament. You ought to try it sometime.
>
> "Q. Then what happened?
>
> "A. We stood around there about 35 to 40 minutes, I guess, before anybody decided to take me to the station. In the meantime, one says, 'Let's take this guy for a walk back through here and leave him.' He says, 'He is caught inside anyway.' Another one says, 'Maybe we ought to take him to the river.' Well, I happen to know what that means, and I know it is something I don't want to experience. And he says, 'Now, are you right for this thing or aren't you?' I said, 'I am it, just put me down, I am guilty.' I says, 'Just get me on down there, I don't want to go to the river.'

1. On the subject of retroactive and prospective operation of these cases, particularly since Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, see 40 F.R.D. 351; 80 Har.L.R. 123, 135–141; 52 A.B.A. 868 and prior to Johnson v. State of New Jersey the debates of the academicians, especially insofar as they expound Jackson v. Denno, supra; 79 Har.L.R. 56; 33 Univ.Chicago L.R. 719; 41 Notre Dame L.R. 206; 64 Mich.L.R. 832.

"Q. Is that why you told them that you were good for it?

"A. That is the reason I told them I was good for it. I don't know the man named Biddie, I don't know where the man come from; I don't know how the place got there, but I know I am in a little old four by four, and I am it. *And I was told they don't even need a statement, they got all they want. They got me inside.*" (Emphasis supplied.)

While Linder implies that Officer Hannah and his partner threatened him with the river, it will be noted that the admissions or "statements" testified to by him were not the same admissions testified to by Officer Reed, only Linder himself said, "I am it, just put me down, I am guilty."

As to Officer Reed, whose testimony need not be repeated, these are the questions and answers, all on Linder's cross-examination:

"Q. What Detective Reed told this jury here is not correct?

"A. *Not in its entirety.*

"Q. All right.

"A. Detective Reed told his side of the story the way he seen it. I did not go into detail for 45 minutes to an hour and tell Detective Reed what Detective Reed quoted verbatim here. I told Detective Reed, 'All right, you got me, I am it. All right. So the place is kicked in, I am the guy that is right for it. I don't want to go to the river. I don't want to get shot in the head—'

"Q. Detective Reed didn't—

"A. I have been told by almost every policeman over there that if I am ever caught inside, I am dead, and they mean it.

"Q. *Did Detective Reed tell you he was going to take you to the river?*

"A. *No, I don't think Detective Reed did.* Detective Reed stated on this wit-

ness stand he had informed me of my rights, and he did not.

"Q. Well, let's get back to what you told Detective Reed.

"A. I just told him, 'I am right for it.'

"Q. *Did you tell him that you made that hole on the second story wall?*

"A. I told you what I told him. I said, 'I am right for it.' *Now, maybe he assumes that I told him I made that hole. I did not.*

"Q. *My question is, did you tell him that you made that hole?*

"A. *Not in those words, no.*

"Q. *What words did you tell him you made the hole?*

"A. *I just told him, 'I am right for the beef.'* They got me charged with burglary. I don't want to go to the river.

"Q. His testimony is that you told him that you made the hole, you went in the building, and that you were opening the front door to let a man come in with the truck. Is that what you told him?

"A. I told him that the man put me in the door and sent me around to open that door, that overhead door, so he could back the truck in there. That is what I told Detective Reed. Then when I was pinned down and threatened, I said, 'Okay, I am right for the beef. Take me to jail.'

"Q. *Did Detective Reed threaten you?*

"A. *I said no, Detective Reed didn't threaten me, personally.*

"Q. *Was he there when somebody else did?*

"A. *He showed up later.* There was two other people there. Then a colored man on the paddy wagon came along and slackened the handcuffs on me after my hands swelled up and turned purple."

\* \* \* \* \* \*

"Q. *What did Lieutenant Reed do to you? Did he physically assault you?*

"A. *No, he did not.*

"Q. *Did he mess with your handcuffs?*

"A. *He didn't do a thing with them.* He took me back out of the paddy wagon and he walked me around there. He walked me around through the building all right.

"Q. *You say he did not threaten you?*

"A. *No, Detective Reed didn't threaten me.*

"Q. *So when you were talking with Detective Reed with no form of threat or violence, you admitted that you were right for it, is that right?*

"A. *I made the statement for all involved.* The other two policemen were standing there, and I said, 'Okay, I am right for it. Take me to jail. I don't want to go to that river.' "

 Mindful that if one confession, statement or admission is "simply part(s) of one continuous process" in which several confessions are obtained, all are invalid (Leyra v. Denno, 347 U.S. 556, 560, 74 S.Ct. 716, 718, 98 L.Ed. 948, 952), Linder's own testimony makes Jackson v. Denno and other cases, state and federal, relied on by him inapplicable. Carefully considered his testimony is hardly a straight-faced denial of anything that Officer Reed testified to, in fact he all but admitted the truth of everything Reed said. State v. Brown, Mo., 404 S.W.2d 179, 182. There is certainly in his testimony nothing that would seriously refute the essence of the substantive offense of burglary. In fact his testimony is at least a tacit affirmation of everything of substance that Reed said and was corroborative of the indisputable fact, "They got me inside." Without further analysis and demonstration, in the language of Johnson v. State of New Jersey, by the time any law enforcement officers appeared on the scene, Linder's was not an "unsolved crime" and any "custodial investigation" was in fact superfluous. By any test, including the "totality of the circumstances," this was not an "unsolved crime" and in no event has the "very integrity of the fact-finding process" been averted nor is there the slightest "clear danger of convicting the innocent." Johnson v. State of New Jersey, 384 U.S. 1. c. 728, 86 S.Ct. 1. c. 1778, 16 L.Ed. 2d 1. c. 889; Miranda v. State of Arizona, 384 U.S. 1. c. 479, 86 S.Ct. 1. c. 1630, 16 L. Ed.2d 1. c. 726; State v. Beasley, Mo., 404 S.W.2d 1. c. 692; State v. Rapp, Mo., 412 S.W.2d 120; State v. Craig, Mo., 406 S.W. 2d 618. In short in these detailed circumstances and upon this particular record the trial court was not compelled of its own volition to separately determine and find the voluntariness of any incriminating statements Linder may have made, certainly not those testified to by Officer Reed. In this view there was not as a matter of fact a manifest infringement of the appellant's constitutional rights within the meaning of either the federal or state cases, as in Jackson v. Denno or State v. Williams, Mo., 369 S.W.2d 408, and therefore the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.