**STATE of Missouri, Respondent,**

v.

**Lillie DILL, Appellant.**

No. 44498.

Supreme Court of Missouri.

Division No. 2.

Sept. 12, 1955.

Motion for Rehearing or for Transfer to Court En Banc Denied Oct. 10, 1955.

457

Morris A. Shenker, Sidney M. Glazer, Mark M. Hennelly, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Will F. Berry, Jr., Asst. Atty. Gen., for respondent.

EAGER, Judge.

Defendant, Lillie Dill, was indicted in the City of St. Louis for the first degree murder of Alonzo Small on September 7, 1953. She was found guilty of manslaughter and sentenced to ten years in the penitentiary. Motion for new trial was filed and overruled. The case has been briefed here by both parties.

The essential facts shown in the state's case are as follows: the slaying occurred in a beer tavern at 1416 Biddle Street in St. Louis at about 9:00 P.M. There were various people then present, but the number is uncertain. The place was operated by one Sampson Jones, who was present. The deceased, Alonzo Small, (usually referred to as Lonzo) was sitting at a table with two other men. One Josephine Stanley had sat down at that table with a bottle of beer shortly before the shooting. According to the state's witnesses, the defendant, Lillie Dill, entered the front door of the tavern a few minutes before the shooting, walked to the side of the deceased, touched him on the shoulder and apparently spoke to him; the witnesses differ as to whether he answered her; she walked a few feet away, came back and tapped him on the shoulder and perhaps spoke again. If deceased answered her at all, it was merely a casual remark or question. Defendant then walked a short distance away (probably four to eight feet) and while facing toward the deceased, drew a revolver out of her bosom, pointed it at the deceased and started shooting. (Certain of the spectators then began a hasty exit, some,—they say,— so hurriedly that they only heard one shot.) Several of the witnesses testified that they heard four shots, and in rather rapid succession. Sampson Jones, who had been in the rear of the place, slipped around the bar and grabbed the defendant, "tussled" with her for the gun, both in the place and out on the sidewalk where they fell down. He was able to get the revolver from her, either by her own volition or otherwise. Soon after the shooting started, Lonzo Small fell to the floor, never spoke, and was shortly found to be dead. He had no weapon of any kind. There was very definite

evidence that the defendant pointed the revolver at Lonzo Small while he was seated at the table and immediately before she began shooting. The weapon used was a .38 snub-nosed Colt revolver which was turned over to the police by Sampson Jones and which was produced and identified at the trial. After the shooting the revolver was found to contain two live shells and four empty shells. There was some evidence that Small at the time appeared to be nodding or sleeping or about half asleep, with his arms on the table and his head bent forward. The testimony of the witnesses for the state (with one exception, noted later) did not show any action or participation by Josephine Stanley in the affray, nor did it show that the defendant shot at Josephine Stanley. Two of the witnesses were nephews of the deceased. The deceased was killed with one shot through the lower part of the neck or upper part of the chest, entering above the collarbone. No witness in the case testified to any threats by the deceased or to any action or argument on his part.

A signed statement given by defendant to police was introduced by the state without objection. This followed rather generally her testimony at the trial, except for matters hereinafter noted. It was shown in evidence that the bullet which killed the deceased was fired from the revolver which had been used by the defendant, and that this revolver required a pressure of about four pounds on the trigger when fired single action (that is, when cocked first) and about twelve to fifteen pounds of pressure when fired double action. One witness testified that the defendant said to the deceased before the shooting, "Get up and come on out of here you so-and-so, I told you I was goin' to kill you in this place." Josephine Stanley testified (for the state) that after defendant fired at Lonzo Small and hit him, "She fired at me and shot me through the right shoulder," while the witness was seated at the table; that when Lillie "leveled down" to shoot at her again, "I jumped up and grabbed her arm," and that Sampson Jones "tussled" with Lillie trying to take the gun away from her; and

that one shot was fired "after I grabbed her arm."

The defendant testified: that the deceased lived at her place part of the time and at a house kept by him and his nephew part of the time; that she cooked for him; that she stayed at "his house" sometimes; that she had previously, at his request, taken a "gun" to him on perhaps three or four occasions, but she did not know definitely whether it was this same gun or not; that this particular revolver had been in her house for about two days; that shortly before the shooting the deceased called her on the 'phone and told her to bring his gun to him, stating that he had "walked into some trouble and needed it," and that he would meet her at a certain street corner; that she got the gun from under the pillow on her bed, put it in her bosom and walked to that location. She did not see him on the street corner, so she looked first in one tavern and then in the tavern in question, saw him through the window and walked on in; that she proceeded to his side, touched him on the shoulder and said, "Now, come on; I got it;" that he looked right past her, so she walked around, came back, touched him again on the shoulder and he again "looked off;" that at this time Josephine Stanley jumped up, grabbed a beer bottle and said, "I'll take care of this old no good biddy," and started "cussing me," and at the same time "she made for me then;" that at this time the defendant "pulled the gun out of my bosom * * * intendin' to frighten * * * not intendin' to shoot nobody—harmin' nobody;" and "I don't know whether I pulled the trigger or what happened," but the gun went off, "I would say once." She further testified that Josephine caught hold of her and that they "tussled" from side to side; that Josephine caught her by the hair, and finally Sampson Jones entered the melee and took hold of the defendant and that they all wrestled out to the sidewalk where they fell; that Josephine kept trying to get Sampson Jones to give her the gun, to which defendant protested vigorously, and defendant finally gave it to Sampson; that at the time of the struggle

relatives of the deceased were yelling, "Kill 'er, kill 'er," so she ran away some distance through a "gangway" and hid until some people behind her had passed by. She also testified on cross-examination: that on this occasion she did not look to see if the gun was loaded and that she had never fired a gun before; that she did not know when anybody was shot on the occasion in question. No other witness testified for defendant concerning the occurrences in question. There was no evidence that defendant and deceased were or had been married.

The trial court instructed on first degree murder, second degree murder, and manslaughter; it further instructed on self-defense and accident and gave a very clear general instruction on the presumption of innocence, reasonable doubt, and the burden of proof, together with several cautionary instructions. The first, and perhaps most vigorous, claim of error concerns the self-defense instruction. That instruction (digested to its essence) told the jury: "* * * if you believe * * * that at the time * * * the defendant shot and wounded Lonzo Small, if you find the defendant did so, she, the defendant, had reasonable cause to believe and did believe that * * * Josephine Stanley, was about to take her life or to do her some great personal injury, * * * and * * * that it was necessary for her to use force in order to protect herself *from such danger* * * * then defendant should be acquitted on the ground of self-defense. Whether the defendant had reasonable grounds to believe that *such danger* existed, and whether she shot and wounded the said Lonzo Small while defending herself against attacks by *another person* in the honest belief that *it* was necessary for the protection of her life or person, are questions which you must determine from all the evidence in the case. Even if no real danger existed, yet if the defendant had reasonable cause to believe, and did believe, that it existed, she would be justified in acting upon such belief and should be acquitted." (Italics inserted).

We have had grave doubt as to whether the defendant was entitled to any self-defense instruction at all in this case, in view of her utter failure to testify that she did intentionally shoot in self-defense. However, her testimony was not so positive in affirmatively eliminating self-defense as that in the case of State v. Baker, Mo., 277 S.W.2d 627. In view of previous decisions permitting that defense to be shown or aided by other evidence of the state or defense, and even to be used inconsistently with other defenses, State v. Wright, Banc, 352 Mo. 66, 175 S.W.2d 866, we have determined, with some misgivings, that such an instruction was proper here and we proceed to a consideration of it.

Appellant's first complaint of this instruction is that it directed an acquittal only if defendant believed that it was necessary for her to shoot *Lonzo Small* in order to protect herself, and that it thus deprived defendant of the benefit of self-defense if deceased was unintentionally shot. We do not think the instruction is subject to that complaint. The cases cited (such as State v. Whipkey, 358 Mo. 563, 215 S.W.2d 492) hold that if one, acting in justifiable self-defense, shoots at his attacker and kills a third person, the resulting death is accidental homicide. We have no quarrel with that principle, and it was recognized here by the giving of an accident instruction which very materially supplemented the instruction on self-defense. More specifically, we believe that the words italicized by us in the above quotation, i. e., *"such danger," "another person,"* and *"it"* could not fairly have been understood to refer to anything but the supposed attack by Josephine Stanley and the use of defensive force against Josephine Stanley. We think that any other construction is strained, especially in view of the fact that no witness testified that Lonzo Small ever did *anything* to require defendant to shoot at him, or to give her any possible excuse for doing so. The instruction does not exclude an unintentional shooting of Lonzo Small, and that

element was expressly covered in the next instruction; nor does the instruction require a finding that the shooting of deceased was "necessary." This contention is denied.

■ The next objection to the self-defense instruction is that it does not incorporate nor is it coupled with a specific instruction on reasonable doubt and the burden of proof as applied to such defensive matter; or, in other words, that the instruction does not specifically tell the jury that the burden of proof is on the state to show beyond a reasonable doubt that defendant did not kill the deceased in self-defense. We note here that Instruction Number 6 was entirely sufficient as a general instruction on reasonable doubt "of defendant's guilt," the presumption of innocence, and the burden which rests on the state to prove defendant's guilt "to your satisfaction and beyond a reasonable doubt." The only objection lodged against it (as against the self-defense instruction) is that it is not broad enough to advise specifically of the state's burden on self-defense. In a claim of self-defense it is incumbent generally on the defendant in the first instance to *go forward* with enough evidence to put the matter in issue; it is not incumbent on the state to disprove self-defense when it has not been put in issue (State v. Strawther, 342 Mo. 618, 116 S.W.2d 133, 120 A.L.R. 583; State v. Malone, 327 Mo. 1217, 39 S.W.2d 786); but once the matter has been put in issue, if the evidence then raises a reasonable doubt in the minds of the jury as to defendant's guilt in view of that defense, he must be acquitted. To that extent the burden rests on the state. But, after all, that burden is merely a part of the general burden of the state to prove defendant's guilt beyond a reasonable doubt.

Counsel cite only one case, State v. Robinson, Mo., (Div. Two), 255 S.W.2d 798, to support the present contention. In that case the self-defense instruction was expressly held to be erroneous because it was thought to require the defendant to *establish* the defense to the satisfaction of the jury, thus affirmatively casting the burden of proof on that issue upon the defendant. In this we think the decision is entirely correct. The court then said that a self-defense instruction "should be coupled with an instruction on reasonable doubt as to the defensive matter * * * and * * * correctly cover the subject of the burden of proof." Citing 41 C.J.S., Homicide, §§ 378, 380, 384; 120 A.L.R. 591. We think, and so hold, that the latter statements were not necessary to the decision and that they do not represent the Missouri law. We have found no Missouri case holding that an otherwise proper self-defense instruction (i. e., which does not cast an undue burden on defendant) is erroneous solely because it is not coupled with a specific instruction on the burden of proof (or reasonable doubt) on the defensive issue. We have examined many of the cases cited in 41 C.J.S., Homicide, §§ 378, 380, 384, and find that almost without exception these were cases where the self-defense instruction, in and of itself, was construed as placing an undue burden on the defendant, and was held erroneous for that reason. We do not think that these cases, generally considered, support some of the broad statements in the text. The Missouri case there cited, State v. Malone, 327 Mo. 1217, 39 S.W.2d 786, held a self-defense instruction bad because, in one part, it put the burden of proving self-defense on the defendant, and in another part instructed on reasonable doubt; this was held to be inconsistent, in and of itself. See also: State v. Strawther, 342 Mo. 618, 116 S.W.2d 133, following and discussing the Malone case. The annotation in 120 A.L.R. 591, following a report of the Strawther case, is expressly confined to cases in which the self-defense instruction improperly placed the burden of proof and where the courts were considering whether other instructions corrected the error.

■ We hold that the present self-defense instruction does not cast any improper burden on the defendant, and that when it is considered together with the

general and sufficient given instruction on the presumption of innocence, reasonable doubt, and burden of proof, it is not erroneous. In criminal cases, as well as in civil cases, all the instructions must be considered together. It has been held that it is not necessary to repeat the "reasonable doubt" phrase in the various instructions, if the matter is adequately covered. State v. Westmoreland, Mo., 126 S.W.2d 202, citing cases; State v. Bundy, Mo., 44 S.W.2d 121. The phrase was used here in six different instructions, including all the main instructions of the state. The jury was specifically told here that the burden was on the state to prove defendant's *guilt* beyond a reasonable doubt; this fairly included and embraced all issues, including that of "disproving" the asserted claim of self-defense, so long as there was nothing inconsistent or misleading in the self-defense instruction. We hold that there was no error in the self-defense instruction in the respects claimed.

■ Counsel also complain of the accident instruction (No. 5) because it does not hypothesize specific facts on two theories of possible accident,—(a) that the gun may have been accidentally discharged; and (b) that defendant may have shot at Josephine Stanley in self-defense and accidentally hit Alonzo. The instruction told the jury that one of the defenses was that deceased "came to his death by accident," and that if there was a reasonable doubt on the matter the defendant must be found not guilty; it specifically and broadly defined the term "accident" in an all-inclusive manner. We hold that the instruction was sufficient to cover both theories of accident and that it was unnecessary to hypothesize specific facts. The instruction must be considered in the light of the facts hypothesized in the self-defense instruction, immediately preceding. "Accident" is a common term which the ordinary layman understands; moreover, the opposing factual theories here were clear cut, and we think the jury understood this instruction as exonerating the defendant in any event if she unintentionally shot deceased while

justifiably defending herself. It is at least doubtful whether she was entitled to the benefit of theory (b) above, in view of her complete failure to testify that she intentionally shot at Josephine Stanley in self-defense, but we shall not belabor that point further. To have given an instruction in line with the present contentions would really have amounted to a repetition of the self-defense instruction with the accidental killing of a third person interwoven. The case of State v. Whipkey, 358 Mo. 563, 215 S.W.2d 492, again cited, merely asserts the principle of accidental homicide, of which defense this defendant was not deprived. The claim of error in Instruction 5 is denied.

Counsel also complain of Instruction No. 6, the instruction on the burden of proof, the presumption of innocence, and reasonable doubt of guilt, but only in that the instruction is not worded so as to apply specifically to the question of self-defense. We have already discussed that matter and we hold that the instruction was sufficient.

■ It is next suggested that the trial court erred in allowing the Assistant Circuit Attorney to "pledge the prospective jurors on voir dire * * * to disregard the sex of the defendant" and that such action prejudiced her by requiring them to ignore a proper circumstance of her "self-defense." The point seems to be that she, as a woman, might need more force in protecting herself (or an "equalizer," so to speak) than would a man, and that the jury were forced to forego that consideration. Similar questions were asked of four or five prospective jurors to the following general effect: would the fact that the defendant is a woman affect or influence your judgment or your verdict as to her guilt or innocence? These persons indicated that it would not. We interpret these questions as merely inquiring whether the fact that defendant was a woman would evoke any sympathy which might react unduly in her favor. Such matters are very largely discretionary with the trial court in any event. State v. Linders, Mo., 224 S.W.2d 386; State v. Miller, 357 Mo. 353,

208 S.W.2d 194. Of course, the jury may consider all applicable physical facts on the issue of self-defense, but we do not believe that these questions and answers pledge the panel (or any of its members) to disregard the fact that defendant was a woman for that purpose, nor do we think that the prospective jurors were committed in advance to any opinion; the situation is entirely different from that in State v. Thursby Mo., 245 S.W.2d 859, where veniremen were asked to which of two classes of witnesses they would give more credence (and similarly different from State v. Hawkins, 362 Mo. 152, 240 S.W.2d 688). The contention is denied, for we do not feel that the inquiries, fairly considered, prevented the jury from considering all necessary elements of self-defense, including the fact that defendant (as well as her supposed attacker) was a woman. There is no affirmative showing that any of the veniremen so questioned were actually placed on the trial jury, but we do not rely on that in so ruling. We note also that defense counsel made no effort to ascertain, by questions of his own, whether the state's inquiries actually tended to have the effect now claimed.

 The next assignments argued concern the sustaining of objections by the state to certain questions asked by defense counsel. We take these in order. (1) State witness Georgia Jones was asked "if there were ever any crap games run in this tavern." When objection was sustained, an offer of proof was made, based on the theory that the evidence sought would show that defendant had previously brought a gun to the deceased at his request and thus "a continuing line of conduct with respect to the circumstances." We have concluded that the possible operation of crap games in this tavern was a matter too remote to be relevant; the question apparently was asked in an effort to show *why* defendant had the gun on this occasion. None of the evidence indicated the operation of any crap game on this occasion; on the contrary, defendant testified positively that deceased had told her that "he walked into some trouble and needed it," thus offering a specific reason wholly inconsistent with the circumstances now urged. The offer of proof is not sufficiently definite to raise the contention that the previous trips with the gun had been for the purpose of permitting deceased to pawn it in a crap game (as suggested elsewhere), but we hold that the evidence was properly excluded regardless of that. For a wholly different reason the evidence was immaterial. The only possible relevancy would arise from a desire to negative malice and premeditation. Defendant was only convicted of manslaughter, in which crime malice and premeditation are, and here were, expressly excluded. The evidence could not have been material in view of the verdict and its exclusion was certainly not prejudicial error. The evidence of prior acts which was admitted in State v. Knight, 356 Mo. 1233, 206 S.W.2d 330, was admitted solely on the issue of "malicious intent." (2) James King was asked whether he had "ever been in any games that Josie was running" and an objection on the ground of irrelevancy was sustained. What we have said above applies equally to the answer here sought, and moreover no offer of proof was made. The assignment should be disregarded for that reason, if no other. State v. Barbata, 336 Mo. 362, 80 S.W.2d 865. (3) Defendant was permitted to testify on direct examination (and over objection) that she had previously taken "guns" to the deceased three or four times; when asked what he used the gun for she stated that "he would be gambling; he borrowed money on it." A late objection was made and sustained. Even giving an adverse effect to this ruling, we note again that no offer of proof was made. And for all the reasons stated above, we think the evidence was immaterial, and that the ruling could not have constituted prejudicial error.

 The next assignment concerns the overruling of defendant's objections to questions asked defendant on cross-examination. She had testified that after the melee in the tavern some of deceased's "relatives were hollerin, 'kill 'er, kill 'er, kill 'er, kill 'er'" and that she ran to a

church, through a gangway, and hid under a stove until "they" (the people behind her) passed. On cross-examination she stated (without objection) that she told this to the police, and that it was included in the written statement which she gave the police; she was then asked to take her written statement (received in evidence without objection) and see if she could find that she had said that she hid and some nephews were chasing her. The objection then made was that the question went beyond the examination in chief. The objection was overruled and the witness said, "No." (While defendant's direct testimony did not specifically state that the relatives "chased" her, such was a fair inference.) The argument now is that the question and answer tended to imply that the testimony of defendant at the trial "was of recent fabrication." Under Section 546.260 RSMo 1949, V.A.M.S., the cross-examination is limited to matters "referred to in his examination in chief." It is obviously impossible to draw any clear-cut lines of distinction on such a question. Cross-examination need not be confined to a categorical review of the matters stated in direct examination, but may cover any matter within the fair purview of the direct examination. State v. Lemon, Mo., 263 S.W. 186; State v. Wilson, 321 Mo. 564, 12 S.W.2d 445; State v. Revard, 341 Mo. 170, 106 S.W.2d 906; State v. Glazebrook, Mo., 242 S.W. 928. We think counsel here opened the door for impeachment on the subject by failure to object previously, if, in fact, the question was outside the scope of the direct examination. It may be noted also that defendant's counsel brought out on cross-examination of the officer who assisted in taking defendant's statement that defendant said nothing to them about deceased's relatives chasing her. While this latter evidence cannot alter the rule of cross-examination, it certainly tends to show a lack of prejudice here. Defendant's written statement was in evidence in its entirety, without objection; the jury had presumably heard it read and knew its contents. The question and answer objected to could really have added nothing to the prior state of the evidence.

■ The general rule is that where a defendant has testified "all about the homicide" in a criminal trial, he may be cross-examined "with respect to statements made by him * * * in regard to matters to which he had testified in chief on the trial." State v. Punshon, 133 Mo. 44, 34 S.W. 25, 27. The case of State v. Cook, 132 Mo. App. 167, 112 S.W. 710, is cited by appellant. The basis of the ruling there was that it was improper to ask defendant whether or not he had made certain statements previously in police court, which he had testified to at his trial; it was held that such would show no inconsistency nor would it constitute impeachment. For the various reasons stated that opinion is not persuasive here. On the contrary, it was held in State v. Bundy, Mo., 44 S.W.2d 121, that when defendant had testified to previous assaults by deceased she might be asked on cross-examination whether she had reported such assaults to the police, on the ground that such was "with reference to a matter testified to on direct examination." We need not consider the point made that it was error to permit defendant to be asked if she could find in the written statement anything to show that she told the police that she had previously taken a gun to the deceased. That question and answer were not objected to.

■ The last point made concerns the supposed erroneous admission of evidence in rebuttal; a witness for the state was permitted to testify that he had seen defendant pull a similar gun "out of her bosom" on a previous occasion, at the home of the deceased and himself. Counsel objected and moved for a mistrial on the ground that such was not proper rebuttal, was wholly irrelevant and was prejudicial. The objection and motion were overruled. Counsel now urge also that the evidence tended improperly to prove "another offense" but no such objection was made. We do not think the evidence was irrelevant, as defendant was being tried on a charge of first degree murder. Its admission was not prejudicial because defendant herself had testified specifically that she had carried this gun or a similar gun to

deceased three or four times and that she had, on occasion, procured it from his house. The witness did not state here that defendant pulled the gun *on* anyone, or attempted to shoot anyone, and in that respect the situation is to be distinguished from the cited case of State v. Phillips, 233 Mo. 299, 135 S.W. 4.

We have considered all of appellant's assignments, perhaps to the point of tediousness. Defendant was ably represented by counsel, and we are convinced that she had a fair trial. No error appears, or is claimed, in the indictment, verdict, judgment or allocution. The judgment is affirmed.

All concur.