STATE of Missouri, Respondent,

v.

Jasper Lee DAVIS, Jr., Appellant.

No. 5,527.

Supreme Court of Missouri,
Division No. 2.

Feb. 14, 1966.

Motion for Rehearing or for Transfer to Court En Banc Denied March 14, 1966.

Norman H. Anderson, Atty. Gen., Jefferson City, Edward P. McSweeney, Sp. Asst. Atty. Gen., Clayton, for respondent.

Norman S. London, St. Louis, for appellant.

EAGER, Presiding Judge.

Defendant was found guilty by a jury of first degree murder and the jury imposed a life sentence. The charge arose from an indictment. For some months prior to trial

and at the trial defendant was represented by an attorney privately employed; he had previously had other counsel, presumably appointed, who was permitted to withdraw. Counsel filed a motion for new trial containing 47 assignments of supposed error, but has chosen not to brief the case here. We shall consider on the merits those which are sufficient under Criminal Rule 27.20. Many of these do not set forth with particularity any specific grounds or causes for a new trial and they will be disregarded; this includes assignments 1–10, inclusive, and 45. We have explained so many times the requirements of this rule that we shall not lengthen this opinion further by quoting or describing these assignments. After the overruling of that motion defendant was permitted to appeal as a poor person. Where assignments of a like nature may be discussed as a group, we shall follow that method.

The first group of appropriate assignments contests the sufficiency of the evidence to establish (1) first degree murder, and (2) second degree murder. It will therefore be necessary to recite the evidence in some detail.

Six or seven students of St. Louis University had attended a night baseball game at Busch Stadium in St. Louis on April 22, 1964; they sat in two groups, but met after the game and waited a short time for the crowd to thin out. These boys were approximately 20 years of age, some a little more, some less. One John Lough was to furnish transportation home with his father's car, and they all walked to a parking lot on Grand Boulevard about two blocks from the Stadium. After they drove on to Grand and proceeded a very short distance in bumper to bumper traffic, Lough found it necessary to get out to urinate. One of the others took the wheel, assuming that in such traffic Lough would overtake them. He did not come back immediately and, after proceeding a short distance, the boys turned and drove back; two or three got out briefly to look for him, but soon returned and all drove south again. At the Washington intersection James Ready, the decedent in this case, and James Richard Caccamo got out again and started walking back north on the east side of Grand to look for Lough. From this point on we confine our recital to the specific circumstances of this crime, and the facts which follow are those which the jury could reasonably have found. These two boys were wearing khaki trousers, sport shirts, St. Louis University jackets and no hats. They crossed Franklin and were approaching Bell, proceeding along a space where there was broken sidewalk, an old building and a vacant lot. They saw a group of Negro youths coming toward them, probably 12 or 15, and they moved over to the inside of the walk, walking with their heads inclined downward; they said nothing and they had nothing in their hands. (The racial designations of the different participants are noted throughout the transcript, and were in some particulars material.) As the Negro group approached Ready and Caccamo, one of the group, either Johnny Mason or a boy named Simmons, said "Let's off these white dudes," which, as translated, means to hit them or beat them up. As Johnny Mason reached Caccamo, he struck the latter on the side of the face or head with his fist knocking him down, and two others of the group kicked the fallen man in the head as he lay there. Ready, in the meantime, had walked or run ahead a very short distance, but he looked back, saw what had gone on, and came back "swinging," as one or more described the scene. He obviously attacked Mason with his fists; some of the others had moved away, but defendant Davis remained very close to the combatants and was hit by a hand or fist, presumably Ready's. Davis, who testified, did not know himself whether the blow was intended for him or not, but he said that he was knocked down; another member of the Negro group, Calhoun, testified that Davis was struck when Mason "weaved" and thus avoided a blow. Davis, while he was down or partially down, pulled his knife from his jacket pocket, opened it with one hand and thumb, arose, and after being on his feet (as

he described it) for two or three seconds, stabbed Ready in the chest severing a coronary artery. Mason, who testified during the State's case but not enthusiastically, stated that he saw Davis (defendant) fall and then saw him jump up and start *swinging* at Ready, striking him in the chest area, but that he saw nothing in defendant's hand at the time. Calhoun, another of the group, saw Davis take the knife from his pocket, saw the knife in his hand, and saw that he (defendant) "brung it up and struck the boy somewhere in his chest." Davis himself testified that Ready (supposedly somewhat larger than he was, but totally unarmed) had started towards him and that he thought that Ready was going to "harm" him or "kill" him. No one else testified to similar facts, although three of his group testified for the State. After the stabbing Davis became scared and ran, pursuing a devious course to his home and dropping the knife on the way. It is thus seen that the killing was admitted by the defendant in his trial testimony. Caccamo testified that he and Ready did not touch any of the other group as they passed.

Caccamo eventually got to his feet, saw Ready staggering, saw him fall, tried to assist him and saw him take two deep "gasps of air," and then called for help. He was carried across the street to the Veterans' Hospital where he was pronounced dead. There was much testimony concerning the activities of various members of this group on that evening and prior to this occurrence, but nothing of sufficient materiality was developed to require discussion. There were four character witnesses for defendant. Additional phases of the evidence will be referred to as necessary in discussing specific assignments of error.

■ We first consider the sufficiency of the evidence to sustain a conviction for first degree murder. The basic statutory requirements are willfulness, deliberation and premeditation. Section 559.010, RSMo 1959, V.A.M.S. (All statutory references will be to that revision.) The distinction between first and second degree murder lies in the existence or nonexistence of deliberation. State v. Goodwin, Mo., 352 S.W.2d 614. The willfulness, deliberation and premeditation required for a conviction of first degree murder may all be inferred from and established by the circumstances attending a homicide. State v. Thompson, Mo., 363 S.W.2d 711; State v. McCracken, 341 Mo. 697, 108 S.W.2d 372; State v. Small, Mo., 344 S.W.2d 49; State v. Johnson, 362 Mo. 833, 245 S.W.2d 43; State v. Williams, Mo., 369 S.W.2d 408. Thus, while a presumption of second degree murder arises from an intentional killing with a deadly weapon, used upon a vital part of the body, with nothing more appearing, State v. Small, supra; State v. Goodwin, supra; State v. McCracken, supra, the further element of deliberation may be inferred from the circumstances. Small, McCracken, Thompson. Malice is, of course, presumed or implied by the law in every unlawful killing. State v. Dunn, 18 Mo. 419; State v. Holme, 54 Mo. 153; State v. Johnson, 362 Mo. 833, 245 S.W.2d 43. The term "deliberation" has been defined many times and its meaning has not been changed over the years. In State v. Holme, 54 Mo. 153, an instruction was approved which told the jury that: " * * * if the party killing had time to think, and did intend to kill, for a moment as well as an hour or a day, then such killing is deliberate, willful, and premeditated killing, * * *." And as early as State v. Dunn, 18 Mo. 419, the Court said, loc. cit. 424: "If the party killing had time to think, and did intend to kill, for a minute as well as an hour or a day, it is a deliberate, wilful and premeditated killing, constituting murder in the first degree." Many of the cases require that the act, in order to constitute a deliberate killing, must be done in the "cool of the blood," but require no extended time for the deliberation. State v. Davis, 226 Mo. 493, 126 S.W. 470; State v. Bobbst, 269 Mo. 214, 190 S.W. 257; State v. McCracken, supra; State v. Small, Mo., 344 S.W.2d 49; State v. Jones, 64 Mo. 391. In State v. Davis, supra, the Court approved the following as a correct definition of de-

liberation, 126 S.W. loc. cit. 477: " * * * 'it does not mean brooded over or reflected upon for a week or a day or an hour; but it means a conscious purpose to kill, formed in a cool state of blood, and not under violent passion suddenly aroused by some real or supposed grievance.' " In State v. McDaniel, 94 Mo. 301, 7 S.W. 634, the Court said at 7 S.W., loc. cit. 636, that deliberation: " * * * is defined to 'mean in a cool state of the blood, as opposed to a heated state; and in deliberating there need be no appreciable space of time between the intention to kill and the act of killing. They may be as instantaneous as successive thoughts of the mind.' The terms cool and heated state of the blood are not used in any technical sense. They indicate clearly enough that the killing must have been done, not from passion, but from the 'free act of the will,' and if so done, the act was done with deliberation, though the act had not been brooded over or reflected upon." The matter is extensively discussed in State v. Speyer, 207 Mo. 540, 106 S.W. 505, 14 L.R.A.,N.S., 836. The case of State v. Small, Mo., 344 S.W.2d 49, is rather close to the present case on the essential situation, for there the defendant, convicted of first degree murder, had apparently considered the act of killing only long enough to pick up a single-barreled shotgun, cock it and shoot, plus possibly the time required to put in a shell; and there was no obvious or real reason for the act. Under the authorities it appears that a finding of deliberation depends not so much upon the time element as it does upon an inference, reasonably drawn from the evidence, that the defendant performed the act in a cool and deliberate state of mind.

■ Here, this defendant needlessly stuck closely to a fistic encounter between two other persons, was struck by a hand or fist (perhaps by accident) and knocked down. He immediately, and while still down, drew and opened his knife, then got to his feet with the opened knife, remained standing (according to his own testimony) for two or three seconds, and plunged the knife into the chest of James Ready who, all this time, was fighting Mason. The matter of self-defense is a wholly separate issue. The jury obviously disbelieved that defense, as well it might. Under the authorities, defendant had time to deliberate his act in "the cool of the blood" and to determine, as he did, to stab Ready; and the jury could reasonably so find. The evidence was sufficient to convict him of murder in the first degree. It is entirely obvious, this being true, that the evidence was also sufficient to convict him of second degree murder, and that the choice was up to the jury. This disposes of eight assignments of the motion for new trial.

■ A rather pointless assignment is made to supposed error in not excusing 49 of 50 persons called on the voir dire, because they had "previous knowledge" of the case, and were therefore unable to try the issues impartially. These persons were not challenged for cause. Practically all of the people called on the panel had read of the killing in the newspapers or had seen something concerning it on television. The prosecutor and the Court, as well as defense counsel, were most assiduous in searching out those who had formed opinions which might influence them; all such persons were immediately excused, generally, if not always, upon motion of the State. Defense counsel passed each separate panel of the voir dire for cause, and just before the trial proper began entered a sort of "shot-gun" objection to all but one member of the then panel because all such persons had read or heard of the case. This is certainly no valid ground of objection per se, and the assignment is of no merit whatever. Section 546.150; State v. Spica, Mo., 389 S.W.2d 35; State v. Thompson, Mo., 396 S.W.2d 697, opinion adopted December 13, 1965. Under these circumstances, it was wholly inappropriate to bring here in the transcript approximately 190 pages of voir dire examination at the cost of the State.

■ Johnny Mason was produced as a State's witness. He testified that one of

the white boys "brushed or bumped" him, that he pushed him off, and he fell; he then testified that he didn't "think" he hit the boy and finally said that he did not. The State's attorney then asked leave to cross-examine the witness from the notes of his testimony before the grand jury, and leave was granted. By way of objection counsel for defendant merely said, "It is the State's witness." An assignment of error has been made to the permitting of this cross-examination. We note here that no objection was made on the basis of grand jury secrecy or privilege. In brief, questions and answers were read to Mason to the effect that he hit the boy with his fist and that he fell. Mason then testified that he recalled the questions and answers, that he gave the answers, and "that is what happened." The cross-examination of a reluctant witness is a matter resting very largely in the discretion of the trial court. Counsel for defendant has stated in his motion that the witness was not "hostile." That is a relative term, and it clearly appeared here that the witness was not telling the facts previously testified to; the Court was shown the grand jury notes before he ruled. We hold that the matter was one within the discretion of the Court. While such prior testimony is generally admissible merely as impeachment, Mason's final admission that the facts as so stated were true, made those notes substantive testimony. See the distinction and discussion generally in State v. Kinne, Mo., 372 S.W.2d 62, and note that the principal opinion there was not adopted as the opinion of the Court. The trial court may infer from the testimony and conduct of the witness an effort to suppress the truth. See, generally, Tripp v. United States (CA 10), 295 F.2d 418, 424, 425; State v. Patton, 255 Mo. 245, 164 S.W. 223; State v. Taylor, Mo., 324 S.W.2d 643, 76 A.L.R.2d 671; State v. Bell, 359 Mo. 785, 223 S.W. 2d 469; Mooney v. Terminal R. Ass'n of St. Louis, 352 Mo. 245, 176 S.W.2d 605.

■ In two separate assignments counsel asserts that error was committed in admitting testimony that defendant had previously been seen with the knife in question, once earlier on the same evening (witness Mason), and also during that afternoon (witness Calhoun). The objections now are that the evidence was totally irrelevant, and that it was prejudicial. If such evidence is closely connected with the crime and tends to establish or explain the act, it is material and admissible; and if sufficiently material, it is not to be excluded merely because it may be prejudicial. In one part of this evidence Mason testified that the defendant was showing the knife and "popping" it open; in the other the knife was described, the blade being three or four inches long and the point sharp. This evidence was definitely of sufficient materiality to be admissible; for one thing, it bore directly on the deadly nature of the knife as a weapon. Particularly is this true in view of defendant's own testimony that he seized the knife from his pocket and opened it on the first attempt with one thumb. On the question generally, see State v. Dill, Mo., 282 S.W.2d 456, 463; State v. Taylor, Mo., 324 S.W.2d 643, 76 A.L.R.2d 671. The contention is denied.

■ Complaint is made of the use by the State's attorney of the use of the word "assault" in a comment during the cross-examination of Mason. After a colloquy between the Court and counsel all the relief that defendant's counsel finally requested was granted.

■ The Court declined to permit defense counsel to question the witness Mason upon cross-examination concerning any "sentence" he had received in the Juvenile Court in connection with his participation in these events. This is now made an assignment of error, with the suggestion that such evidence was admissible to show the witness' interest. Counsel apparently feels that for this purpose the general rule of nondisclosure of juvenile proceedings is inapplicable. The witness was 17 years of age at the time of trial, but 16 at the time of these occurrences. No offer of proof was made except an offer to show that the

witness was now living at, and was brought back from, Boonville, presumably with the inference that he was confined at the Training School for Boys there. Counsel for defendant produced no authority and the Court sustained all such objections. While the statutes have been changed somewhat since 1959, the case of State v. Tolias, Mo., 326 S.W.2d 329, expressly ruled that all such evidence was inadmissible. Our present § 211.271 provides that no adjudication upon the status of a juvenile "shall be deemed a conviction * *." We are inclined to the view that such evidence was inadmissible, but we rule that there was no error because no offer of proof was made on the one material element, namely, the disposition of Mason's case, and because, in any event, we consider the ruling as nonprejudicial to defendant. The acts of Mason had been fully shown, and he admitted that he had "lied" to the police when arrested and that this was not his first "involvement" with the police; he was also contradicted by his testimony before the grand jury. His juvenile record would have added nothing substantial to this array.

■ Certain hospital records and the brief testimony of a hospital physician were received for the purpose of showing the condition of James Caccamo after the attack upon him. Error is now assigned, upon the ground that the evidence was irrelevant in that the present case does not involve any offense against Caccamo; and that the evidence was prejudicial. This case did definitely involve the attack upon Caccamo as an integral part of the whole incident, and his condition immediately following the attack was clearly admissible; this, to confirm the fact that he had been struck, if for no other reason. See State v. Bell, 359 Mo. 785, 223 S.W.2d 469, 471. No objection was made at any time to the direct testimony concerning the striking and kicking of Caccamo, and this evidence of his condition immediately thereafter was merely incidental.

It is claimed that the admission of defendant's question and answer statement or confession was error: (1) because it was shown that it was not voluntary; (2) because defendant had been in custody for "many hours" and had not been taken before any judge or magistrate; (3) because it shows on its face that he was not advised of his right to consult any attorney; and (4) because he had requested an attorney. Defendant was arrested rather early in the morning of April 24, 1964 (one witness stated at 5:15, defendant said later) and taken to Police Headquarters. He was questioned for a time by two detectives, and a little later Mr. Crawford, the Chief Trial Assistant to the Circuit Attorney, was called. He testified that he first saw the defendant between 7:30 and 8:30, but another witness thought that this occurred about 9:30. Mr. Crawford testified, both in the hearing outside the presence of the jury and before the jury, in substance, as follows: that he talked with defendant for a short time before the statement was begun; that he told the defendant that he did not have to make a statement; that no promises were made; that defendant made no complaints of any mistreatment and that he saw no evidence thereof; that a stenographer was called in, that she recorded the questions and answers and transcribed them, that defendant then read the statement aloud in his presence, initialled certain minor corrections and signed the statement in his presence and in the presence of two officers. The confession states that it was signed at 1:18 p. m. on April 24; it also states, by way of an affirmative answer to a question, that defendant understood that under the Constitution of Missouri he did not have to make a statement, and that any such statement could be used against him in a future trial. In the preliminary hearing Mr. Crawford also testified: that he told defendant that he could use the telephone if he wished, but that defendant felt "it would be embarrassing and that he did not want to face his parents or talk to anyone about it"; that he thought he had discussed with Davis his right to an attorney

when he first talked to him, although no reference to this was included in the written statement; that he informed defendant that a statement could be used against him; that defendant did not indicate any "hesitancy about giving" the statement. Defendant testified, *outside* the presence of the jury, that he was arrested between 5:30 and 6:00 o'clock a. m. on April 24, that he was not taken to court until April 27, that he had no lawyer, that at Police Headquarters he was "slapped," his head was bumped against the wall, and he was kicked on his shin, that he gave the statement three or more hours after his arrest, that he asked for a lawyer, but got no response, that they "beat" him when he "wouldn't say I did it," and refused to make a statement. At the conclusion of the hearing held outside the presence of the jury, the Court overruled the motion to suppress the confession and found and ruled that the statement was voluntary. This he dictated into the record, a practice which it would be well for all trial courts to follow.

Mr. Crawford testified before the jury that, prior to the taking of the question and answer statement, he did inform Davis that he was entitled to see an attorney. One of the officers present at the taking of the statement testified positively before the jury that defendant was told that he was entitled to an attorney, that he was not mistreated in any way, that he was denied nothing, that he was informed that he need not give a statement and also that anything he said could be used against him in court. The defendant testified in his own behalf before the jury. Therein he made *no reference whatever* to the confession or to any circumstance connected with it. The jury, therefore, had *no evidence* to indicate that it was involuntary, though it had the inherent right to *disbelieve* the State's witnesses. Defendant, in his trial testimony, admitted the stabbing, named some of the persons with him, and testified to certain occurrences prior to the killing. He further testified: that Mason struck one of

the white boys right after one Simmons said, "There are two white dudes, lets off them"; that no one had touched Mason; that he was struck by Ready and knocked down, either purposely or accidentally; that Ready and Mason were the only ones fighting; that deceased came "towards" him and that he thought deceased was going to "hurt" him or "kill" him, so he drew his knife and swung at him with it; that he opened the knife with one thumb "the first time" he tried, and that he had been on his feet for two or three seconds before he stabbed Ready; that when he got on his feet the knife was open and in his hand and that, in fact, the knife was open before he got up; that he got up with the opened knife. He saw two others kicking or "stomping" Caccamo, and said that he wanted to stop them at the time he was struck.

The Court, as stated, found that the confession was voluntary. The jury obviously did so, for it could hardly have found otherwise on that fact issue, upon the testimony before it. In this state of the record the confession was clearly admissible unless it can be said that it was inadmissible as a matter of law because defendant had no attorney. Some details included in the confession differed somewhat from defendant's trial testimony; defendant stated therein that he tried to "cut" Ready, but that he "stuck" him because he had been drinking (for whatever that explanation may have been worth); he made no reference therein to self-defense, but said nothing which would have excluded it; other differences consist generally of matters of greater or lesser detail.

We have never held that the lack of an attorney when a defendant is interrogated and a statement is taken renders the confession invalid per se. We have in mind the cases of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Spano v. People of State of New York, 360 U.S. 315,

79 S.Ct. 1202, 3 L.Ed.2d 1265, but there were additional material facts in those cases. We discussed those opinions to some extent in State v. Donnell, Mo., 387 S.W.2d 508, at loc. cit. 511. In that opinion we said in part: "In Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed. 2d 1448, it was held that mere interrogations without counsel while in custody, resulting in a confession, did not constitute a violation of defendant's constitutional rights or render the confession involuntary, even though counsel was requested * * * There were also dissents in that case. There the Court said in part: 'Petitioner, however, contends that a different rule should determine whether there has been a violation of right to counsel. He would have every state denial of a request to contact counsel be an infringement of the constitutional right *without regard to the circumstances of the case*. In the absence of any confession, plea or waiver—or other event prejudicial to the accused—such a doctrine would create a complete anomaly, since nothing would remain that could be corrected on new trial. Refusal by state authorities of the request to contact counsel necessarily would then be an absolute bar to conviction. On the other hand, where an event has occurred while the accused was without his counsel which fairly promises to adversely affect his chances, the doctrine suggested by petitioner would have a lesser but still devastating effect on enforcement of criminal law, for it would effectively preclude police questioning—*fair as well as unfair*—until the accused was afforded opportunity to call his attorney. Due process, a concept "less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights," Betts v. Brady, 1942, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595, demands no such rule.'" We have held on various occasions that the mere holding of a defendant for more than twenty hours does not invalidate a confession or a judgment of conviction. State v. Keeble Mo., 399 S.W.2d 118, adopted February 14, 1966;

State v. Williams, Mo., 369 S.W.2d 408; State v. Goacher, Mo., 376 S.W.2d 97; State v. King, Mo., 380 S.W.2d 370; State v. Worley, Mo., 383 S.W.2d 529; State v. Bryant, Mo., 375 S.W.2d 122, and Donnell, supra. It was shown here, *without controversy*, that defendant was advised that he did not have to make a statement and that any statement made could be used against him. He did not see fit to repeat *before the jury* his testimony that he asked for a lawyer, after the trial court had made a finding that the confession was voluntary. He was under the guidance of astute and experienced counsel at the trial. We hold that there is an absence here of any showing of prejudice from the admission of the confession, that defendant's trial was not rendered unfair by his detention or by the lack of counsel, and that the Court did not err in admitting the confession.

 Counsel complains also in his motion concerning the admission or the failure of the Court to exclude certain specific parts of the confession as follows: (1) a reference to *seeing* a dice game earlier in the same evening and hearing an argument with police, in which defendant in no way participated; (2) statements indicating that Johnny Mason had lost his "straight razor" and that "they" were going along Grand in an effort to find it when they met Ready and Caccamo; and (3) a statement that the blade on defendant's knife was about three inches long, and that he knew this because he "always measured it" with his finger; this latter statement was included in a general description of the knife, including a statement that the knife could be *popped* open fast, "instead of pulling it open with two hands * * *." Item (1), supra, referred solely to acts of other persons and could not have been prejudicial; moreover, the defendant voluntarily testified to the same matters when he was on the stand in his own behalf, upon questioning of his own counsel. Item (2) also involved another person, Johnny Mason, and the supposed loss of his razor; that statement cast no as-

persions on defendant and was not prejudicial to him. It was relevant to some extent, as it showed the reason why Mason and the defendant were at this particular spot at the time of the occurrences in question. The same evidence had previously come in without objection in the testimony of Mason. Item (3), the description of defendant's knife, was definitely material since this was the weapon with which he stabbed Ready; if that evidence was prejudicial it was nevertheless admissible.

 During the cross-examination of a character witness for the defendant it was brought out that he was a very good friend of defendant; at that point counsel for defendant interrupted the proceedings by asking twice if that would affect his testimony in any way. The Court permitted an answer and counsel for defendant then said "That is all"; thereupon counsel for the State, obviously somewhat irritated, said: "Forget it." A colloquy ensued, defendant's counsel made motions to strike, to instruct the jury and for a mistrial, all of which were overruled. If there was anything improper in the statement defendant's counsel brought the situation upon himself by his unseemly interruption, and we also hold that the remark was not prejudicial.

 Objection is also made to a reference by the State's counsel in final argument to the "accident" instruction as "one of the theories of the defense * * *"; counsel for defendant now says that the instruction was an instruction of the Court, like all others, and that the remark was derogatory and prejudicial. The complete answer is that the Court gave counsel all the relief he asked.

Defendant assigns error in the giving of various verdict forms to the jury. They were not included in the transcript, but we now have certified copies. We have examined all of them and, without further lengthening this opinion, state that we find no

prejudicial error, considering them as a whole.

 Allegations of error have been made to the giving and refusal of certain instructions. The first is that the Court erred in instructing the jury that, in order to constitute manslaughter, the killing must have been without malice *and* without premeditation, whereas the killing might legally have been found to be manslaughter if *either* malice or premeditation was absent. The cases do not so hold. State v. Sebastian, 215 Mo. 58, 114 S.W. 522, 528; State v. Malone, 333 Mo. 594, 62 S.W.2d 909, 911; State v. Curry, Mo., 372 S.W.2d 1; State v. Dill, Mo., 282 S.W.2d 456. And we have very definitely held that *malice* must be absent in all manslaughter cases, State v. Davis, Mo., 328 S.W.2d 706, so defendant's theory here is obviously unsound. Moreover, there can ordinarily be no reversible error in the giving of a manslaughter instruction where the jury has found defendant guilty of first or second degree murder. State v. McMullin, 170 Mo. 608, 71 S.W. 221; State v. Emory, Mo., 246 S.W. 950. That rule also covers the other objection to the manslaughter instruction, namely, that it created an impression that a killing in "lawful defense of the person" was different from "justifiable homicide." We also find on the merits that no such criticism is justified; the last paragraph in the instruction expressly defined justifiable homicide as the killing of another *in the lawful defense* of one's person.

 Defendant makes no complaint of the first degree murder instruction under which he was found guilty. He does complain of the instruction concerning the voluntariness of his confession, in that it did not "allow the jury to consider whether or not the failure to advise the defendant of his right to an attorney, or to provide the Defendant with an attorney" prior to the taking of his statement, constituted an element of involuntariness. That Instruction, No. 8, told the jury to consider any such

statement or statements "in the light of the circumstances under which they were made" and to determine whether or not they were voluntarily made or were "procured by coercion or threats or through fear * *." We consider that it was wholly unnecessary, and perhaps it would have been improper, for the Court to single out and include specifically that one element, thus giving it an undue emphasis. But, in addition, the defendant himself made *no reference whatever* in his testimony before the jury to the confession or to the circumstances attending it; one of the officers present at the time testified not only that there was no mistreatment and no promises, but that defendant was informed that he was entitled to an attorney, as did Mr. Crawford. In this state of the evidence it would have been particularly inappropriate to emphasize the present contention with no supporting evidence before the jury. The jury was specifically told to disregard any statements of deceased if it found that they were not "voluntarily made." The point is denied.

The Court gave, in customary form, an instruction on the presumption of innocence and reasonable doubt. Counsel complains because that instruction stated, in part, that a reasonable doubt "ought to be a substantial doubt * * * and not a mere possibility of defendant's innocence," contending that this is a misstatement of the law of reasonable doubt. The substance of the instruction as given has been approved time and again. State v. Turner, Mo., 320 S.W.2d 579; State v. Velanti, Mo., 331 S.W.2d 542; State v. Hutsel, 357 Mo. 386, 208 S.W.2d 227. The point is wholly without substance. Error is also assigned to the refusal of defendant's proffered In-

structions "B," "C," and "D," dealing with the same subjects. When the Court has once fully and properly instructed on a subject or subjects, it is not error to refuse further instructions thereon. State v. Hutsel, 357 Mo. 386, 208 S.W.2d 227; State v. Peterson, Mo., 130 S.W.2d 505. Complaint is also made of the refusal of Instruction "A," a self-defense instruction. The Court had fully covered the question of self-defense in Instructions 4 and 6, which are not attacked. In this situation the rule just stated is applicable and there was no error.

Assignments 42, 43, 46 and 47 allege error in the overruling of defendant's motions for a judgment of acquittal of first and second degree murder, respectively. We have covered these assignments in our ruling on the sufficiency of the evidence and the discussion therein. Another assignment is that the Court erred in failing to instruct "regarding criminal intent and intent in general." That element was sufficiently covered in all the basic instructions. Those concerning first and second degree murder required that the act be done "willfully," which was specifically defined to mean intentionally. In the manslaughter instruction the word "intentionally" was specifically included. The instructions were in customary form and there was no occasion for elaborating upon the subject of intent in considering these specific, statutory crimes. See State v. Stogsdill, 324 Mo. 105, 23 S.W.2d 22.

The defendant had a fair trial and we find no prejudicial error in the record. We have also examined those matters required by Criminal Rule 28.02 and find no prejudicial error therein.

The judgment is affirmed.

All of the Judges concur.